## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| **CARA WESSELS WELLS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CASE NO.**   5:23-cv-60 |
| **TEXAS TECH UNIVERSITY,** | § | |
| **SAMUEL PRIEN, LINDSAY** | § | |
| **PENROSE, et. al.** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Cara Wells ("Dr. Wells" or "Plaintiff") files this, her original complaint against Texas Tech University ("TTU," or "the University"), Dr. Samuel D. Prien ("Dr. Prien"), and Dr. Lindsay Penrose ("Dr. Penrose," and collectively "Defendants"), as follows:

## I.
## PRELIMINARY STATEMENT

1.      In its mission statement, Texas Tech University highlights the institution's alleged commitment to education, ethics and student success. It reads, "As a public research university, Texas Tech advances knowledge through innovative and creative teaching, research and scholarship. The university is dedicated to student success by preparing learners to be ethical leaders for a diverse and globally competitive workforce. The university is

1

committed to enhancing the cultural and economic development of the state, nation and world."

2.      Unfortunately, Dr. Cara Wells' experiences at TTU stand in stark contrast to these principles. Over the course of more than a decade, Dr. Wells was sexually harassed and degraded at the hands of her professor, Dr. Samuel Prien, aided by his associate, Dr. Linsday Penrose. Threatened by Dr. Wells' academic success—and later, business acumen—Dr. Prien and Dr. Penrose soon made it their mission to "put Dr. Wells in her place." Their campaign against her involved taking credit for her work, interfering with her job prospects, and pursuing financial opportunities to which they were not entitled. When Dr. Wells reported their behavior to TTU, the University failed to investigate her accusations, offer her protection from Dr. Prien, or honor its commitment with respect to her hard-earned patents.

3.      At the outset, Dr. Wells viewed the chance to participate in TTU's Agricultural Department, under the direction of Dr. Prien and Dr. Penrose, as an exciting opportunity to conduct important research and launch her career in animal science.

4.      Even during her early days in the program, Dr. Wells' experience was sexualized and gendered. For example, Dr. Prien often paraded the young and then-inexperienced Dr. Wells around to his peers at industry conferences and events.

5.      However, as Dr. Wells began to exhibit signs of independence and receive recognition on her own well-earned successes, Dr. Prien, who is frequently accused of misconduct by his students, used his position of power to initiate a campaign to bring Dr. Wells into submission.

6.      During her tenure at TTU, Dr. Prien and Dr. Penrose subjected Dr. Wells to a constant barrage of harassment and a hostile educational environment. The misconduct perpetrated by the professors included forcing a young Dr. Wells—on numerous occasions—to share hotel

rooms with Dr. Prien and Dr. Penrose at academic conferences. After Dr. Wells exhibited distaste for those experiences—which she should have never had to endure—the ridicule and humiliation delivered by Dr. Prien and Dr. Penrose ranged from belittling comments about her clothing choices to comments questioning her dedication and talent.

7.     To add insult to injury, Dr. Prien and Dr. Penrose took advantage of Dr. Wells' academic and commercial achievements—the same achievements they mocked her for pursuing. Beginning with her time as an undergraduate research assistant, Dr. Wells did not receive credit for her contributions to technological innovations, patents, and academic research. Dr. Wells was made to believe that she was simply "paying her dues" as a student researcher. In reality, she was being denied credit she was due. TTU failed to protect her from these harms.

8.     Having excelled as an undergraduate, Dr. Wells returned to TTU as a PhD candidate. She looked forward to making major contributions in her lab studies, and she held out hope that she would finally be treated with respect. Unfortunately, she soon learned that the mistreatment would only worsen.

9.     As a PhD student, Dr. Penrose took credit for more of Dr. Wells' work, including an important embryo technology patent. As the mistreatment exacerbated, it became clear that Dr. Prien felt some sense of entitlement to insert himself into all aspects of Dr. Wells' life, including the personal and social aspects of it.

10.     After Dr. Wells did her best to set clear boundaries, Dr. Prien, again aided by Dr. Penrose, made it his mission to sabotage her newly emerging career, even going so far as to attempt to block her from obtaining post-graduation employment.

11.     Nevertheless, after she completed her doctorate at TTU, Dr. Wells founded her first company. She returned to TTU—the community where she had invested years of her life—

to seek support. To Dr. Wells' excitement, her company, Embryotics, was accepted into TTU's Accelerator Program, a program that fosters and supports entrepreneurs launching innovative startups. Soon after, Dr. Wells founded a second company, called EmGenisys. Dr. Wells embarked on exciting and innovative research related to determining embryo viability for creating pregnancy.

12.     Despite her obvious and well-earned success, Dr. Wells was unable to rid herself of the continued antagonistic behavior and meddling of Dr. Prien and Dr. Penrose. Dr. Prien stole research from Dr. Wells that he obtained as a result of a position of confidence based on his role as a TTU mentor. True to form, he submitted that research for publication at a conference for his own gain, a violation of several ongoing non-disclosure agreements.

13.     Despite her professors' behavior, Dr. Wells believed that she could rely on the resources and support of TTU. Soon after, however, Dr. Wells learned that Dr. Prien and Dr. Penrose had already sowed seeds of distrust towards Dr. Wells within the TTU research faculty, making unsubstantiated accusations that Dr. Wells' company's technology was stolen. Without a proper investigation, TTU accepted the lies of Dr. Prien and Dr. Penrose and removed Dr. Wells—without notifying her—from patents, articles, and various TTU websites, where she had previously been given recognition.

14.     Dr. Wells' relationship with TTU ended in 2022 when, after being recruited to serve as a mentor to other TTU inventors, the school unceremoniously fired her from the committee within the Accelerator Hub. TTU subsequently sent out a defamatory message to others in the TTU community forbidding them from contacting Dr. Wells or doing further work with her.

15.     Dr. Wells has dedicated her entire adulthood to advanced and innovative research in the space of reproductive sciences, and in particular, the selection of embryos likely to be

successful in in vitro fertilization (IVF) transfer procedures for humans and animals, alike. She is the exact type of student, scholar, and businesswoman that any professor or university would be proud to support and encourage to return to provide mentorship and expertise to the next generation of students. She exhibits the traits and aspirational goals celebrated in TTU's mission statement. The harms perpetrated by TTU and its senior faculty are serious, ongoing, and must be remedied.

## II.

## PARTIES

16.     Plaintiff Dr. Cara Wells is the founder and CEO of EmGenisys, Inc, a start-up biotechnology and software company. She attended TTU for both her bachelor's degree and PhD, where she was a research assistant during the years she was obtaining both of her degrees.

17.     Defendant Texas Tech University (TTU) is a public research university in Lubbock, TX.

18.     Defendant Dr. Samuel Prien ("Dr. Prien") is a professor of reproductive physiology at Texas Tech Health Sciences Center (TTUHSC). He resides in Shallowater, TX.

19.     Defendant Dr. Lindsay Penrose ("Dr. Penrose") is an associate professor at TTUHSC. She resides in Lubbock, TX.

## III.
## RELEVANT NONPARTIES

20.     Cameron Smith is a Texas-barred attorney serving as the TTU System Commercialization Director of the Office of Research Commercialization, which not only serves TTU, but also Angelo State University, Texas Tech Health Sciences Center, and the TTUHSC Paul L. Foster School of Medicine in El Paso.  He resides in Lubbock, TX.

21. Dr. Joseph Heppert is the Vice President for Research and Innovation at TTU. He resides in Lubbock, TX.

22. Kimberly Gramm is the Chief Innovation and Entrepreneur Officer at Tulane University and previously served as the vice president of innovation and entrepreneurship at TTU. She resides in New Orleans, LA.

23. Dr. David Snow was the Executive Director of the technology transfer office, where he focused on intellectual property and licensing for all the TTU System campuses. He is now the Executive Director of Technology Ventures at the University of Arkansas. He resides in Fayetteville, AR.

24. Julie Isom is the Associate Director for the Center of Integration of STEM Education and Research (CISER) at TTU. She resides in Idalou, TX.

25. Taysha Williams is the Managing Director at the Innovation Hub at Research Park and is in charge of overall management of programming at the Hub. She resides in Lubbock, TX.

**IV.**

**JURISDICTION AND VENUE**

26. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, because there are federal questions of law at issue, namely violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and Title IX of the Education Amendments of 1972 ("Title IX"). This court has supplemental jurisdiction over Plaintiff's related claims arising under state and local laws pursuant to 28 U.S.C. §1367(a).

27. This court has personal jurisdiction because Defendants maintain physical offices and continuously conduct business in Lubbock, Texas.

28.     Venue is proper pursuant to 42 U.S.C. §2000e-5(f)(3) because a substantial portion of the unlawful acts giving rise to Plaintiff's claims occurred in Texas.

29.     Venue is proper pursuant to 28 U.S.C. §1391 because Defendants are deemed to reside in this District and a substantial part of the events and omissions giving rise to the claim occurred in this District.

## V.
## EXHAUSTION OF ADMINISTRATIVE PROCEDURES

30.     Dr. Wells timely filed with the Equal Employment Opportunity Commission ("EEOC") a charge of sex discrimination against Defendants.[1]

31.     Dr. Wells received a Notice of Right to Sue from the EEOC within 90 days of filing this complaint.[2]

## VI.
## FACTUAL BACKGROUND

### A. Dr. Wells Begins Her Academic Career at TTU and Pursues Her Passion for Animal Science.

32.     In 2009, Dr. Wells enrolled at TTU in the Department of Animal and Food Sciences with hopes of becoming a veterinarian.

33.     As a requirement for her degree in Animal Science at TTU, Dr. Wells enrolled in Dr. Prien's course. As an extra credit assignment, Dr. Wells attended an undergraduate research conference where, much to her excitement, she fell in love with animal science research and decided that she would dedicate her undergraduate academic career to researching complex and novel concepts in the field.

---

[1] Attached hereto as Exhibit A is a true and correct copy of the EEOC Charge of Discrimination, filed November 11, 2022
[2] Attached hereto as Exhibit B is a true and correct copy of the Notice of Right to Sue, issued on December 22, 2022.

34.     At this time, Dr. Prien seemed to show an interest in Dr. Wells' work, so she scheduled a meeting with him during office hours to discuss her interest in his research. After their initial meeting, Dr. Prien accepted her as a research assistant in his lab and helped her attain a research internship at the Howard Hughes Medical Institute. Dr. Wells was hopeful that the scholastic and professional relationship between them would flourish.

35.     Before beginning her work in the lab, Dr. Prien warned Dr. Wells that she could not be "easily offended" and that sexual humor was "part of the job." Dr. Wells brushed this off as Dr. Prien awkwardly attempting to explain the nature of a reproduction lab. Unfortunately, Dr. Wells would soon learn that Dr. Prien was more than a "quirky" science professor.

36.     It was also at this time that Dr. Wells met Dr. Penrose, a senior female colleague of Dr. Prien. Dr. Penrose had been a student of Dr. Prien's during her time as an undergraduate and was accepted into the TTUHSC by Dr. Prien. Dr. Penrose and her family have both on occasions stated that they credit Dr. Prien with Dr. Penrose's life—a sentiment which explains her unwavering support of Dr. Prien, at all costs.

37.     An early incident foreshadowed that Dr. Penrose would not be an ally against Dr. Prien's inappropriate conduct, but rather an accomplice and perpetrator of the harassment. One day working in the lab, Dr. Wells had a disturbing encounter with one of Dr. Prien's colleagues, an older male physician. He made inappropriate remarks to the undergraduate Dr. Wells and even asked for her phone number. When Dr. Wells confided her discomfort in Dr. Penrose, rather than supporting her or reporting the inappropriate conduct, Dr. Penrose shockingly told Dr. Wells to actively pursue the man, because he was a well-known doctor who could "do good things" for Dr. Prien's lab.

   **B.   Persistent Harassment and Bullying by Dr. Prien and Dr. Penrose Continues.**

38.      In October 2012, Dr. Wells was invited to present a poster at the annual American Society for Reproductive Medicine (ASRM) meeting in San Diego, California. The ASRM conference is held in a different city each year and brings together the top experts in the industry to present cutting edge research. In order to be eligible for the event, presenters must submit new and original research. Dr. Wells worked on her presentation for months and was excited for the opportunity to showcase the results of her hard work.

39.      Dr. Wells' excitement soon turned to dread, however, when Dr. Prien—much to Dr. Wells' surprise—demanded that Dr. Wells share a hotel room with him and Dr. Penrose. Being an undergraduate on a trip to an important event with scholars she looked up to, Dr. Wells acquiesced to the demand.

40.      At the conference, wanting to put her best foot forward, Dr. Wells arrived dressed in business attire. Looking disapprovingly at Dr. Wells' attire, Dr. Penrose told Dr. Wells that "lab people wear jeans," and required that she, Dr. Prien, and Dr. Penrose dress alike.

41.      This was the first—but definitely not the last—improper intrusion upon Dr. Wells' privacy and autonomy by Dr. Prien and Dr. Penrose.

42.      In April 2013, Dr. Wells was selected by TTU to represent the University at Undergraduate Research Week in Austin, Texas. Dr. Wells was again required to share a hotel room with her professors.

43.      That spring, Dr. Wells graduated from TTU with a B.S. in Animal Science and moved to College Station to attend Veterinary School at Texas A&M.

44.      After beginning veterinary school, however, Dr. Wells realized that her true passion lied in research, like the work she had done as an undergraduate. She resolved to pursue a PhD. In fall 2013, Dr. Wells gained admission into TTU's doctoral program. Unfortunately, Dr. Prien served as the program's committee chair.

45.     In fall 2013, Dr. Wells attended the annual ASRM conference in Boston, Massachusetts after being asked to present the research she submitted prior to graduating from TTU. She once again was required to share a hotel room with Dr. Prien and Dr. Penrose.

46.     After being embarrassed and being made to dress unprofessionally at the previous ASRM conference, Dr. Wells followed her instincts and wore a blazer (pictured here). Dr. Prien and Dr. Penrose incessantly mocked Dr. Wells for her attire. The comments intimidated Dr. Wells and caused her mental distress.

47.     At the conference, an editor of *Human Reproduction*, a peer-reviewed scientific journal, approached Dr. Wells and offered to publish her research in the journal. Without basis, but with apparent authority, Dr. Prien told Dr. Wells that she could not be the named first author on her own research article and stated that he needed to be listed as the author. He went on to say that this would be the "biggest paper of his career," and viewed being listed as the first author as improving his chances of winning a grant. When the article was published by the journal in September 2015, Dr. Prien was listed as the first author. To Dr. Wells' dismay and shock, Dr. Penrose was also listed as an author – despite her complete lack of contribution and no one having mentioned her potential inclusion to Dr. Wells.

### C. **Dr. Wells returns to TTU to Pursue her PhD and the Harassment Intensifies.**

48.     In spring 2014, after leaving veterinary school, Dr. Wells officially returned to TTU and resumed her role in Dr. Prien's lab.

49.     After months of work, on June 30, 2014, via the University, Dr. Wells, Dr. Prien, and Dr. Penrose filed Provisional Patent Application No. 62/019,034 entitled System and Method for Assessing Embryo Viability. The concept behind the patent application was Dr. Prien's, but Dr. Wells did the hands-on work. Dr. Wells' contributions were innovative, and she was excited when she learned she would be included as an inventor on the patent.

50.     Dr. Prien told Dr. Wells that TTU's policy was to give 40% of any revenue gained from the patent to the inventors, 30% of the revenue to the department from which the idea came, and 30% to the institution. No one ever told Dr. Wells that the revenue for the inventors would not be split evenly.

51.     Around that time, Dr. Wells served as a teaching assistant to Dr. Prien's class. As a result, Dr. Prien and Dr. Wells often discussed ideas that either of them might consider patentable. In one such discussion, Dr. Wells brought up the original concept for using embryo buoyancy to determine embryo sex based on the fact that X chromosomes weigh more than Y chromosomes.

52.     In fall 2014, the annual ASRM conference was held in Baltimore, Maryland, and Dr. Wells was again required to sleep in a room with Dr. Prien and Dr. Penrose.

53.     Following Dr. Wells' presentation, numerous scientists approached her to give praise. This observably angered Dr. Prien and Dr. Penrose. Dr. Penrose spent the remainder of the conference bullying Dr. Wells. In one demeaning incident, Dr. Penrose heated a cookie and then crumbled it onto Dr. Wells bed while staring Dr. Wells in the eye. Dr. Prien knew about the incident and did nothing to remedy or address it.

54.     On June 30, 2015, the University, on behalf of Drs. Prien, Penrose and Wells, filed international patent application PCT/US2015/038665 corresponding to provisional patent application 62/019,034 filed June 30, 2014, and named all three joint inventors of the disclosed technology.[3]

---

[3] Patent protection for the invention referred to as System and Method for Assessing Embryo Viability was first-filed as US Provisional Patent Application No. 62/019,034 on June 30, 2014. One year later, on June 30, 2015, the corresponding international patent application PCT/US2015/038665 was filed that claimed priority to the provisional patent application. Out of the PCT application, US Patent Application No. 15/323,017 was filed (nationalized) on December 29, 2016. Each of these three patent applications is entitled System and Method for Assessing Embryo Viability and contains description of the same invention(s).

55.     By this time, Dr. Wells observed that Dr. Prien had grown more possessive and controlling—and was increasingly emboldened to behave inappropriately.

56.     Often self-righteous in tone, he lectured her frequently about what he termed "morality." Dr. Prien attempted to make Dr. Wells feel guilty if she was not, as he described it, on the "straight and narrow." He enjoyed finding "imperfections" in her that he could exploit or ridicule. As a result, Dr. Wells resolved to try her best to set boundaries with Dr. Prien, keeping all conversations focused on science. He did not respect those boundaries.

57.     In fall 2015, Dr. Prien sent a student to Dr. Wells' home to monitor her after she did not respond to his phone calls. Dr. Wells had simply fallen asleep. Inexplicably, Dr. Prien accused Dr. Wells of abusing drugs. Dr. Prien's aggressive and unsubstantiated accusations—and complete lack of respect for Dr. Wells' personal boundaries— resulted in psychological and emotional turmoil for Dr. Wells.

58.      In 2016, the ASRM conference was held in Salt Lake City, Utah, and, once again, Dr. Wells attended. Having learned from previous experience that she would be expected to share a hotel room with Dr. Prien and Dr. Penrose, Dr. Wells preemptively invited her mother, using it as an excuse to share a room with her instead. Dr. Prien and Dr. Penrose were visibly angered by Dr. Wells' decision not to sleep in their hotel room. In retaliation, Dr. Prien and Dr. Penrose ignored Dr. Wells and her mother during the conference.

59.     At the conference, Dr. Wells had the opportunity to present to a large group of professionals about her research. She dressed professionally, in a knee length skirt. After the successful presentation, in one of the only instances in which the professors deigned to acknowledge her, Dr. Penrose told Dr. Wells that no one was paying attention to the presentation because they had been looking at Dr. Wells' legs the entire time. Dr. Penrose asked Dr. Wells why she felt it was necessary to dress "that way." Sadly, not even the

presence of Dr. Wells' mother, herself a professional engineer, had a chilling effect on the harassment.

60.     By this time, Dr. Wells understood that she had to either silently suffer harassment by her professors or face retaliation—to the detriment of her education and career.

61.     In summer 2016, Dr. Wells began writing her dissertation. Despite Dr. Wells' hard work on the dissertation, in what seemed a concerted effort, Dr. Prien and Dr. Penrose baselessly accused Dr. Wells of failing to take her studies seriously. This harassment caused Dr. Wells to second-guess her dedication and ability during a key time in her education.

62.     Dr. Wells ultimately published her literature review from her dissertation. As the professors involved, Dr. Prien and Dr. Penrose were expected to offer feedback, support, and constructive criticism. They offered none of those things. Nevertheless, they demanded that they be listed as co-authors despite their lack of contribution and, indeed, unprofessional treatment of Dr. Wells throughout the experience.

63.     By 2017, Dr. Wells began to prepare for her PhD defense, an already anxiety-inducing affair on the best of terms. Her apprehension was heightened by relentless undermining and mistreatment by Dr. Prien and Dr. Penrose.

64.     As testament to her professionalism and quality of work, Dr. Wells passed her defense. On the day of the defense, despite having worked with Dr. Wells for over seven years, Dr. Prien ignored her entirely. Dr. Prien's behavior did not go unnoticed by Dr. Wells' family members, who were in attendance and similarly ignored by Dr. Prien.

65.     In 2017, Dr. Wells graduated with her PhD in Animal Science. Sadly, Dr. Wells was so traumatized that she felt she could not walk at graduation.

  **D.  Dr. Prien and Dr. Penrose Begin Their Campaign to Undermine Dr. Wells' Success Following Graduation.**

13

66.     After graduation, Dr. Wells applied for jobs in her field. Given Dr. Prien's involvement in her work and status at TTU, Dr. Wells listed him as a referral. During this time, Dr. Prien called Dr. Wells on a constant basis to discuss *his* views on *her* future. He offered Dr. Wells an unpaid position in his lab. Dr. Wells respectfully declined this offer, hoping to find a paid position more commensurate with her qualifications and experience.

67.     After more than six months of applying to what seemed like hundreds of jobs, Dr. Wells was frustrated and disheartened that she had not yet landed a position. She and her now-husband needed income and healthcare, so reluctantly she submitted her application to work at a Tory Burch retail store. During one of the numerous telephone calls from Dr. Prien, he asked Dr. Wells how things were going. She truthfully told him that she was frustrated that she had to apply to a retail position after working hard to obtain her PhD.

68.     Much to Dr. Wells' shock and dismay, Dr. Prien told her that he had been waiting for this moment—and conveyed his excitement that Dr. Wells was now "humbled." He went on to admit that, when potential employers had contacted him as one of Dr. Wells' references, he told them that he could not recommend her for the job. Dr. Prien's casual revelation of such deceit was physically sickening to Dr. Wells. Her career prospects had been sabotaged.

69.     In hindsight, Dr. Wells sees Dr. Prien's pathological behavior for what it was: When Dr. Prien could no longer intrude beyond Dr. Wells' set boundaries, he began actively campaigning against her success. For example, when Dr. Wells made it known that she planned to leave TTU and pursue a career elsewhere after obtaining her PhD, Dr. Prien's hostility observably heightened. After all, Dr. Wells leaving TTU would mean that Dr. Prien could no longer direct or take credit for her successes. Dr. Prien interfered with her job application process so that she would have no choice but to return to an assistant's position in his lab—a job offer she had rejected.

14

70.    Eventually, Dr. Wells was offered and accepted a position as an andrologist at a company called Ovation Fertility. The lab director at Ovation was thrilled to have Dr. Wells because she was over-qualified for the role, which typically only requires a bachelor's degree. The lab director told Dr. Wells that he hoped to promote her quickly and she accepted the job in order to have income and health insurance.

71.    Toxic as ever, Dr. Penrose told Dr. Wells that she was not qualified to hold this position, despite Dr. Wells' stellar academic record in both her bachelor's degree and PhD.

### E.  Dr. Wells Founds her First Company, Embryotics.

72.    While working at Ovation, Dr. Wells began building her first company, Embryotics. Embryotics was created to develop embryo selection technology that relied on noninvasive embryo and oocyte assessment techniques to determine embryo quality, viability, oocyte competency, and cell survival of cryopreservation using a novel specific gravity device. Some of the concepts stemmed from Dr. Wells' graduate work.

73.    In 2017, the annual ASRM conference was in San Antonio, Texas, and Dr. Wells attended as a TTU representative to present the research she conducted as a PhD student. This time, Dr. Prien insisted that Dr. Wells share a hotel room with him and a male graduate student. This was more that Dr. Wells could endure, and she left the event early. Before she did, however, the male graduate student pleaded with her to stay, stating that he was uncomfortable sharing a room with Dr. Prien.

74.    Over the next months, Embryotics, led by Dr. Wells, achieved numerous accolades.

75.    In the beginning of 2018, Dr. Wells participated in the U.S. National Science Foundation's Innovation Corps (I-Corps), a program focusing on training scientists and engineers to move towards commercialization of their research. Dr. Prien was designated the

Principal Investigator on the project, meaning he was in charge of submitting the proposal and managing the award.

76.      In April 2018, Embryotics represented TTU at the Rice Business Plan Competition and won 8th place overall out of more than 700 applicants. Embryotics was awarded $42,000 in prizes. The same month, Embryotics won the TTU iLaunch Competition, and was awarded $10,000.

77.      On March 30, 2018, TTU filed a Provisional Patent Application 62/650,038 entitled System and Method for non-invasive embryo sexing. Dr. Prien, Dr. Penrose, and Dr. Wells were all listed as inventors. Dr. Prien sent Dr. Wells a text message stating that Dr. Penrose would receive a larger share of the royalty rate because she came up with the idea for the patent. Dr. Wells corrected Dr. Prien and reminded him of their discussions in 2014 in which Dr. Wells came up with the idea of using embryo buoyancy to assess viability. Dr. Prien refused to negotiate with Dr. Wells, his co-inventor whose idea was the brainchild for this patent, and submitted the royalty rate without further discussion. She still was not told how exactly the royalty rate would be divided.

78.      In April 2018, Dr. Wells left her job at Ovation Fertility. She resolved to dedicate all of her time to help the business thrive.

79.      Dr. Wells applied for Embryotics to be accepted into the Accelerator Program at the TTU Innovation Hub, a year-long program that provides selected startup companies $25,000 and additional funding opportunities, monthly business trainings, marketing and business plan support, access to regional professional events, and a team of mentors from various industries in the venture space.

80.      Embryotics was accepted into the Accelerator and awarded the license to the embryo buoyancy technology that Dr. Wells helped to create during her time as a TTU student.  Dr.

Prien was upset that she was "given" the license to the technology. Dr. Wells attempted to appease Dr. Prien by adding him to the team of mentors at the Accelerator Program. As part of his involvement with the Accelerator, Dr. Prien, like all the mentors, was required to sign an agreement to keep confidential the information he learned from the Accelerator Program's participating companies, including Embryotics.

81.     In June 2018, Dr. Wells got engaged to her now-husband. Dr. Wells' other TTU mentors congratulated her and celebrated her good news. In contrast, Dr. Prien, was clearly miffed. His reaction to Dr. Wells' news was so obviously negative that afterwards other mentors reached out to Dr. Wells to see if she was okay. In fact, in an email exchange in 2022 discussing other matters, an Accelerator mentor told Dr. Wells that he retains "a vivid, and unsettling memory" of Dr. Prien's reaction to Dr. Wells' engagement announcement.

82.     Around this time, Dr. Wells was invited by Simplot, a large agribusiness company, to do a sex selection study funded independently of TTU. Dr. Wells invited (and paid) one of Dr. Prien's graduate students with whom she had worked to provide her assistance for the study. Embryotics covered all the expenses with no financial support from TTU.   During this trip, the student confided in Dr. Wells that she was nervous and uncomfortable about being required to share a room with Dr. Prien on research trips.

83.     In spring 2019, Embryotics dissolved as a company. The company was made up of all first-time entrepreneurs and they "learned that while [the technology] was accurate, it wasn't fast enough to be performed at scale, and ultimately the company didn't work out."[4]

   **F.   EmGenisys Rises from the Ashes of Embryotics.**

---

[4] Dr. Wells addressed the dissolution of Embryotics and her focus on EmGenisys in an interview following EmGenisys' success at the Grow-NY Competition in 2022. https://www.farmprogress.com/technology/grow-ny-competition-offers-glimpse-future-ag-tech

84.     Dr. Wells continued pursuing her passion for research and formed a new company called EmGenisys. The original intention for creating EmGenisys was to pick up where Embryotics left off using the TTU embryo selection technologies. However, due to TTU's lack of cooperation in the process to license this technology to EmGenisys, Dr. Wells and the company pivoted away from the TTU technology. EmGenisys currently provides a digital, non-invasive, embryo assessment platform for livestock.

85.     In January 2019, at the National Cattleman's Beef Association meeting, Dr. Wells met the executive team at a company called Vytelle. Vytelle is a precision livestock company that focuses on emerging technologies, particularly those which relate to genetics and cattle. Dr. Wells was excited about the prospect of working with Vytelle and stayed in contact with them as EmGenisys was formed.

86.     A few months later, Dr. Wells obtained a letter of intent from Vytelle for a project that would build upon the technology Embryotics was developing. However, TTU was pursuing IP protection for the base technology which had been developed at TTU. Therefore, Dr. Wells began plans to license that IP, for which she is an inventor, from TTU. The plan was to secure the license from TTU and then apply once again to the Accelerator Program as EmGenisys. To this end, as the shepherd of all things IP at the University, Cameron Smith, Director of the Office of Research Commercialization at TTU, asked Dr. Wells to create and present a business plan which he instructed should include *her* relationship with Vytelle.

87.     Dr. Wells worked on the business plan with Kimberly Gramm, who at the time was the Managing Director of the Innovation Hub and, therefore, key in selecting the startup companies accepted into the Accelerator Program. Ms. Gramm quickly became an advocate for Dr. Wells, which put Ms. Gramm in the crosshairs of Dr. Prien and others at TTU. In fact,

once EmGenisys was accepted into the Accelerator, Dr. Prien accused Ms. Gramm of "nepotism," claiming she was the only reason EmGenisys was accepted.

## G.  TTU Office of Research and Innovation Uses Dr. Wells' Successful New Company as a Means to Poach More of Her Intellectual Property.

88.     Dr. Wells presented her business plan as part of the Accelerator vetting process, and during which Mr. Smith asked numerous questions about Vytelle and showed extraordinary interest in the company. EmGenisys was accepted into the Accelerator Program, and Dr. Wells moved forward with the expectation that EmGenisys would receive the license from TTU for the technology based on promises made by Mr. Smith to Ms. Gramm.

89.     Relying on these promises, throughout the spring of 2019, Dr. Wells sought confirmation from Mr. Smith and the Accelerator Hub that EmGenisys would indeed receive the license to the embryo technology as promised. However, TTU refused to provide assurances.

90.     It was around this time that the tenor of TTU's relationship with Dr. Wells' changed drastically. Dr. Wells now knows that Dr. Prien and Dr. Penrose had, by this time, begun their campaign to thwart Dr. Wells' obtaining the license.

91.     In breach of all assurances made, instead of granting Dr. Wells and her company the license to TTU's embryo technology, Mr. Smith licensed the technology directly to Vytelle, cutting the legs out from under Dr. Wells and, in turn, EmGenisys. Cameron Smith also promised Vytelle that Dr. Wells would work for them, despite having ***no*** discussion with Dr. Wells about this, nor the power to otherwise make such assurances to Vytelle. When Ms. Gramm pressed harder as to why the University issued the license to Vytelle instead of Dr. Wells' company, EmGenisys, she was told that Dr. Wells did not get the license because she was too "emotionally charged," a clear gender-based dig from Dr. Prien and Dr. Penrose.

92.     Even more devastating, at about this same time, Dr. Heppert, Vice President for Research and Innovation at the University, told Dr. Wells that a student had accused Dr. Wells of stealing inventions. Dr. Wells now knows that Dr. Heppert accepted a malicious, unsubstantiated accusation originating from Dr. Prien and Dr. Penrose without proper investigation, and almost certainly amplified it to the University and beyond. Though this was a baseless and clearly false claim, it was harmful for Dr. Wells, given that the accusation was levelled by high-ranking, powerful individuals at the University.

93.     TTU's deception and run-around continued through the acts of Dr. David Snow, who was in charge of the University's IP and licensing programs at the time, and who insisted Dr. Wells disclose, with proof, company formation, identifying information for parties in interest, feedback regarding semen technologies, an updated business plan, and funding structure for embryo technology. It was Dr. Wells' understanding that upon submitting this information, she would finally obtain the license for the embryo technology she had long been pursuing for EmGenisys.

94.     On August 19, 2019, a meeting was held among Dr. Heppert, Dr. Wells, Dr. Snow, Cameron Smith, Dr. Tim Dallas, Dr. Mike Ryan, Kimberly Gramm, Dr. Prien, and Dr. Penrose. The intention of this meeting was to finalize details of which technologies EmGenisys could license and to discuss the fact that the University had erroneously promised Vytelle that Dr. Wells would work for them.

95.     The meeting was a disaster from the start. Dr. Heppert was the one who called the meeting, which required Dr. Wells to fly to Lubbock to attend. All knew Dr. Wells was short of funds, trying to get her start-up company off the ground and only recently having obtained her PhD from the TTU. In an act demonstrating Dr. Heppert's unearned distaste for Dr. Wells, he left the meeting after less than 10 minutes.  Subsequently, Dr. Prien and Dr. Penrose

each made it clear that they did not support Dr. Wells getting access to *any* of the University's technologies. Dr. Snow continued to irrationally insist that Dr. Wells really wanted Vytelle to directly license the TTU technology, instead of through Dr. Wells' EmGenisys. Dr. Wells corrected Dr. Snow and futilely explained that she wanted Vytelle to be a *customer* and that Dr. Snow was weaponizing her contacts against her, a fact he did not deny. Overall, nothing was resolved, and the TTU representatives lied about, among other things, promising Vytelle that Dr. Wells would work for them.

## H. **Dr. Wells Tries to Keep the Peace with Dr. Prien and He Takes Further Advantage of Her Personal Success.**

96.     Dr. Wells tried to remain positive and gain as much benefit as possible in the Accelerator program. Under the advice of Ms. Gramm, Dr. Wells endeavored to make Dr. Prien feel included in the new research, in hopes that if his ego was stroked, he would stop his campaign against her.

97.     Dr. Wells discussed sex selection data in the TTU Accelerator mentor program and, in follow up, Dr. Prien asked to see more of Dr. Wells' data. In an attempt to placate Dr. Prien, Dr. Wells shared the data with him.  True to form, Dr. Prien took the data as if it were his own and used it as a basis to submit an abstract that *he* sought to present at the ASRM conference. Among other things, this was in violation of the Accelerator Program's non-disclosure agreement with its mentors. Ironically, Dr. Prien has taught a course at the undergraduate and graduate level titled "Ethics in Scientific Research" for many years, but intentionally violated ethical standards in his role as a professor, co-inventor, and mentor.

98.     Dr. Wells was concerned that if Dr. Prien was allowed to present this data, it could negatively impact relationships between her current company, past company, and third parties. Among others, Embryotics had an existing non-disclosure agreement in place with

Simplot, which required Simplot's permission in order to disclose the research in which they were participants.

99.     Charitably, Dr. Wells explained her position to Dr. Prien. Instead of apologizing, Dr. Prien acknowledged Dr. Wells' concerns, then refused to withdraw the submission. Dr. Wells had no choice but to contact the ASRM and inform them of the misconduct and misappropriation by Dr. Prien. ASRM removed Dr. Prien's abstract.

100.    Upon finding out that he had been removed from ASRM, Dr. Prien told another graduate student that he was going to "destroy" Dr. Wells. His behavior escalated into the frenetic.

101.    As this conflict escalated, Dr. Wells uncovered further disturbing details. First, Dr. Wells discovered that despite being a primary inventor on the embryo-related patent applications by the University, her allotted proportion of royalties was disproportionately lower in comparison to Drs. Prien and Penrose. Moreover, Dr. Wells was never included in so much as a conversation about how the inventors' royalties should be allotted; naturally, Dr. Wells had always presumed they would be distributed on an equal basis.

102.    Second, Dr. Wells learned that Dr. Prien claimed (and spread the rumor) that EmGenisys' new technology infringed upon TTU patents. Again, these untruthful claims were made maliciously and without basis and have inflicted considerable damage on Dr. Wells. In truth, the technology pioneered by EmGenisys is entirely novel. However, without explanation or notice to Dr. Wells, on September 29, 2021, just a month before the patent was issued, the University, through its attorney Kristopher Lance Anderson, unilaterally removed Dr. Wells as an inventor from US Patent Application No. 15/323,017 on the System and Method for Assessing Embryo viability. The patent issued on November 9, 2021, as US Patent No. 11,169,064 ("the '064 patent"), without Dr. Wells as an inventor. Dr. Wells tried

to discuss these purposeful, harmful and erroneous accusations with Mr. Smith (the attorney serving as the TTU System Commercialization Director of the Office of Research Commercialization), but he refused to speak with her unless she agreed *not* to bring her attorneys. This coercive misconduct by Mr. Smith, TTU's agent, was a power-play by the University over Dr. Wells, with the clear purpose being to avoid her discovering their bad acts.

103.    Indeed, Dr. Wells only found out about being removed as an inventor when reading an article online. In this regard, it should be appreciated that the naming of inventors is not whimsical; correct inventorship specification is a matter of law, and misrepresentations regarding inventorship result in the patent being unenforceable.

104.    Dr. Prien continued his meddling in Dr. Wells affairs into 2022. Early in the year, EmGenisys participated in the Grow-NY Competition, in which food and agriculture businesses compete for the opportunity to win prize money and business development support. EmGenisys was named as a finalist and awarded $250,000 for its innovative embryo assessing system. TTU published an article celebrating this achievement, but Dr. Wells was notified that it had subsequently been removed after Dr. Prien demanded that the article be taken down.  The calculated campaign against Dr. Wells became increasingly distressing, especially because it was based on false accusations which could have easily been investigated and found to be inaccurate.

## I.   TTU Refuses to Acknowledge or Address Dr. Wells' Reports on Dr. Prien's and Dr. Penrose's Misconduct.

105.    Dr. Wells emailed a student body representative asking for help to protect students from the relentless and inappropriate conduct of Dr. Prien and Dr. Penrose on powerless students. She also spoke candidly with Kimberly Gramm and Dr. Tim Dallas, another

Accelerator mentor, about Dr. Prien forcing her to share a hotel room with him and Dr. Penrose on all of their University-sponsored research trips.

106.    During fall 2020, Dr. Mark Sheridan, the Vice Provost for Graduate and Postdoctoral Affairs and Dean of the Graduate School hosted a virtual lunch to obtain feedback on how the graduate school at TTU can better help its students. Dr. Wells stated that the University needed to prevent students from sharing hotel rooms with professors. She also conveyed her view that students often are faced with unnecessary additional expense. For example, Dr. Wells detailed how she paid the expenses for all her large animal studies out of her own pocket while earning her PhD. She followed up this conversation with a letter to Dr. Sheridan reiterating her concerns. He did not respond for over a year.

107.    After Dr. Wells made known her claims concerning Dr. Prien and Dr. Penrose, several other individuals at TTU made independent claims against them alleging similar misconduct. Another individual reached out to Dr. Sheridan to share his experience and specifically stated that Dr. Penrose belittled him but explained that he was fearful that if he came forward to complain, she may retaliate by blocking him from graduating with his master's degree. This was a story to which Dr. Wells related. Furthermore, these complaints were fielded through the University's Human Resources Department, assuring the University's awareness of Dr. Prien's and Dr. Penrose's bad acts and impacts. The University still refused to address or remedy them.

## J.    TTU Retaliates by Perpetuating Baseless Claims that Dr. Wells Stole Intellectual Property.

108.    In May 2022, Dr. Wells executed an agreement to be on the mentor committee in the Accelerator Hub. Because of her experiences, she hoped to be a positive source of mentorship to TTU entrepreneurs.

109.    Shortly thereafter, Dr. Prien wrote and distributed by email a song he titled the "Time to Move on Song," which does not directly name Dr. Wells, but is a clear reference to her. The song is dedicated to "those who believe rumor over fact" and references "accusations" against Dr. Prien that he has "survived."

110.    Dr. Wells' role as a mentor in the Accelerator Hub was finalized in June 2022, after she underwent interviews, background checks and onboarding procedures with Taysha Williams, who had been appointed Program Director at the Innovation Hub following Kimberly Gramm's departure. Dr. Wells was added to the TTU website, making her new position public.

111.    On June 10, 2022, the Office of the General Counsel for TTU called Taysha Williams and instructed that she remove Dr. Wells as a mentor immediately. No legitimate reason was given for removing Dr. Wells. Nevertheless, Ms. Williams followed TTU's orders and removed Dr. Wells from the website and sent the email as instructed to the other TTU mentors telling them that, based on the guidance of the Office of General Counsel and the Vice President for Research and Innovation (Dr. Heppert), they were to cease "any formal relationship with and remove any and all collaboration with" Dr. Wells. The other mentors were specifically instructed to "no longer engage Dr. Wells in Hub programming or involve her in the fulfillment" of the mentorship roles.

112.    Dr. Wells was never approached by the General Counsel, his Office, or any other University or Accelerator representative regarding these adverse actions taken by TTU.

113.    Later that month, Dr. Wells became aware that she had been removed from many TTU publications, including an article honoring her as a distinguished alumnus and an article on EmGenisys. Dr. Wells received no contact or explanation from TTU about her removal from the University's publications.

25

114.    After her firing, Dr. Wells discovered that Dr. Prien claimed that all of his patented technologies for which he is an inventor have been licensed to industry. If this is true, this means that Dr. Wells did not receive *any* royalties from TTU for several patents, on which she is an inventor-in-fact.

115.    Since Dr. Wells filed her EEOC charge against TTU, University representatives seem to be taking a disingenuous interest in at least some of her claims and have reached out, through the University lawyer, Cameron Smith, attempting to justify their removal of Dr. Wells as an inventor and the defamatory campaign launched against her at TTU.

116.    Additional insight into the scheme to tarnish the professional reputation of Dr. Wells in order to profit off her work product continues to come to light even now. For example, in February of 2023, Dr. Wells was informed by a colleague at a research conference that Dr. Prien spread some story that he had hired armed security for the graduate student dissertation defenses in 2020, claiming that he thought Dr. Wells might show up to the event. Dr. Prien and Dr. Penrose have continued to paint the narrative that Dr. Wells is a villain for asserting her rights to her own intellectual property and bodily autonomy. TTU has fully endorsed this destructive campaign and the continued harassment, bullying, and defamation of Dr. Wells weighs upon her constantly. What should have been a formative academic experience that she could look upon fondly, has turned into a living nightmare for Dr. Wells.

## VII.
## CAUSES OF ACTION

### Count One: Violation of Title VII of the Civil Rights Act of 1964

117.    Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

118.    Plaintiff is a woman.

119.    Plaintiff was an "employee" as defined by Title VII, 42 U.S.C. §2000e et. seq.

120.    Defendant, TTU, is an "employer" as defined by Title VII, 42 U.S.C. §2000e et. seq.

121.    Plaintiff was subject to unwelcome sexual harassment.

122.    The harassment was based on sex.

123.    The harassment has inflicted serious harm on and caused severe damage to Plaintiff.

124.    Defendant subjected Plaintiff to adverse employment actions.

125.    Plaintiff suffered harm as a result of Defendant's actions.

## Count Two: Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964 by TTU

126.    Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

127.    Plaintiff is a woman.

128.    Plaintiff is an "employee" as defined by Title VII, 42 U.S.C. § 2000e et seq.

129.    Defendant is an "employer" as defined by Title VII, 42 U.S.C. § 2000e et seq.

130.    Defendant subjected Plaintiff to a pervasive pattern of abuse, hostility, neglect, disregard, intentional sabotage, penalization, and adverse employment actions.

131.    Defendant's misconduct seriously interfered with Plaintiff's ability to perform her work.

132.    Defendant TTU was on notice of the misconduct based on Plaintiff's and others' repeated calls for assistance.

133.    Defendant TTU did not take any steps to correct or prevent the misconduct.

134.    A reasonable person would find Defendant's conduct abusive and hostile.

135.    Plaintiff suffered harm as a result of Defendant's actions.

## Count Three: Retaliation Under Title VII of the Civil Rights Act of 1964

136.    Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

137.    Plaintiff engaged in opposition activity which is protected under §704(a) of Title VII.

138.   Defendant took adverse employment action against Plaintiff that a reasonable employee would consider adverse.

139.   There is an existing causal connection between Plaintiff's activity and the adverse employment action.

### Count Four: Violation of Title IX of the Education Amendments of 1972

140.   Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

141.   Plaintiff was subject to harassment.

142.   This harassment was based on sex and not another motivation.

143.   This harassment had the effect of denying Plaintiff the benefits of an education program.

144.   Defendant, TTU, had actual notice of this harassment.

145.   The harassment was reported to the appropriate person who had the power to address and remedy this harassment.

146.   Defendant, TTU, was deliberately indifferent to the harassment Plaintiff faced.

### Count Five: Unlawful Employment Practice in Violation of Texas Labor Code

147.   Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

148.   Plaintiff is a woman.

149.   Defendant TTU is an "employer" as defined by Texas Labor Code §21.002 et seq.

150.   Plaintiff is an "employee" as defined by Texas labor Code §21.002 et seq.

151.   Defendant TTU knew or should have known that the conduct described above constituting sexual harassment was occurring.

152.   Defendant TTU failed to take immediate and appropriate corrective action.

### Count Seven: Retaliation in Violation of Texas Labor Code

153.   Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

154.    Plaintiff is a woman.

155.    Defendant TTU is an "employer" as defined by Texas Labor Code §21.141 et seq.

156.    Plaintiff is an "employee" as defined by Texas labor Code §21.001 et seq.

157.    Plaintiff engaged in a protected activity, namely filing a complaint against Dr. Prien and Dr. Penrose.

158.    An adverse employment action against Plaintiff occurred.

159.    This adverse employment action is causally linked to the protected activity.

**Count Eight: Correction of Inventorship Pursuant to 35 U.S.C. §256**

160.    Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

161.    Dr. Wells made independent conceptual contributions to the inventions claimed in US Patent No.11,169,064 that issued on November 9, 2021.

162.    Through omission, inadvertence or error, Dr. Wells is not listed on the '064 patent as an inventor of inventions claimed in the patent.

163.    This error occurred without the deceptive intent of Dr. Wells and the patent is therefore subject to correction to name Plaintiff as an inventor.

164.    Under 35 U.S.C. § 256, this Court may order correction of the '064 patent which Dr. Wells has been either removed from or otherwise not listed as an inventor.

**Count Nine: Declaratory Judgment of Patent Invalidity Under 28 U.S.C. § 2201**

165.    Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

166.    In the alternative to Count Eight, the removal of Dr. Wells as an inventor just over a month before US Patent No. 11,169,064 issued was done knowingly and with deceptive intent by the remaining applicants of the '064 patent. The '064 patent should therefore be found invalid.

**Count Ten: Tortious Interference with Contractual Relations**

167.    Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

168.    A valid contract existed between Dr. Wells, Embryotics, and Simplot which was subject to interference by Defendant, Dr. Prien.

169.    Defendant's interference was willful and intentional, and this interference proximately caused injury to Plaintiff.

170.    Defendant Dr. Prien's interference caused actual damage or loss to Dr. Wells.

## Count Eleven: Trade Secret Misappropriation

171.    Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

172.    Dr. Wells' data from her research as part of Embryotics and EmGenisys constituted a trade secret.

173.    These trade secrets were communicated to Defendant Dr. Prien pursuant to their confidential relationship governed by a non-disclosure agreement.

174.    Dr. Prien subsequently used that trade secret in violation of that confidence, directly causing harm to Plaintiff, Dr. Wells.

## Count Twelve: Breach of Contract

175.    Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

176.    A valid non-disclosure agreement existed.

177.    Dr. Wells performed under the contract.

178.    Defendant Dr. Prien breached the contract by sharing confidential data to third parties.

179.    Dr. Wells suffered damages as a direct result of this breach.

## Count Thirteen: Intentional Infliction of Emotional Distress

180.    Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

181.     Defendants acted intentionally or recklessly by perpetuating and allowing the harassment of Plaintiff. Defendants either desired to cause the consequences of these actions or knew that these consequences were substantially certain to result from the actions.

182.     Defendants' conduct was extreme and outrageous.

183.     Defendants' actions caused the Plaintiff emotional distress.

184.     The resulting emotional distress was severe. Plaintiff suffered from embarrassment, humiliation, worry, and fright, among other emotions.

185.     Plaintiff's severe emotional distress cannot be remedied by any other cause of action.

186.     Plaintiff seeks damages within the jurisdictional limits of this Court.

## Count Fourteen: Unjust Enrichment

187.     Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

188.     There is no enforceable contract to govern the dispute between Plaintiff and Defendants Prien and Penrose.

189.     Plaintiff conferred a benefit that enriched the Defendants, including the royalties resulting from patented inventions and unearned professional stature and reputation.

190.     Defendants knowingly accepted the benefit under circumstances that make it unjust to keep it without paying Plaintiff for its value.

## Count Fifteen: Breach of Fiduciary Duty by Defendants Prien and Penrose

191.     Defendants Prien and Penrose owed a formal or informal fiduciary duty to Plaintiff as her co-inventor.

192.     Defendants Prien and Penrose negligently or intentionally failed to act in good faith and solely for Plaintiff's benefit or failed to use reasonable care in carrying out the fiduciary duty owed to Plaintiff.

193.     Defendants' actions proximately caused harm to Plaintiff.

194.   Defendants benefitted from this breach of fiduciary duty.

## Count Sixteen: Breach of Fiduciary Duty by TTU

195.   Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

196.   Defendant TTU owed a formal fiduciary duty to Plaintiff as University to Plaintiff.

197.   Defendant negligently or intentionally failed to act in good faith and solely for Plaintiff's benefit or failed to use reasonable care in carrying out the fiduciary duty owed to Plaintiff.

198.   Defendant's actions proximately caused harm to Plaintiff.

199.   Defendant benefitted from this breach of fiduciary duty.

## Count Seventeen: Fraudulent Concealment

200.   Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

201.   Defendants concealed and/or failed to disclose material facts related to the intellectual property rights and royalties at issue in this action.

202.   Defendants had a duty to disclose material information to Plaintiff because Defendants were co-inventors with Plaintiff.

203.   The information was material because it was important to Plaintiff in making decisions about continuing to work with Defendants and a reasonable person would attach importance to the information concealed by Defendants.

204.   Defendants knew Plaintiff was ignorant of the information and did not have an equal opportunity to discover the truth because of her inferior position as a student and employee.

205.   Defendants deliberately remained silent and did not disclose the information to Plaintiff.

206.   By deliberately remaining silent, Defendants intended for Plaintiff to act without the information.

207.    Plaintiff acted in justifiable reliance on Defendants' concealment.

208.    By deliberately remaining silent, Defendants proximately caused injury to Plaintiff, which resulted in damages.

### Count Eighteen: Negligent Supervision and Retention

209.    Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

210.    Defendant TTU had a legal duty to hire, supervise, train, and retain competent employees.

211.    Defendant TTU breached this duty when Defendant negligently supervised and retained Dr. Prien and Dr. Penrose.

212.    Defendant's breach of its duty to supervise and retain competent employees proximately caused injury to Plaintiff.

### Count Nineteen: Defamation *Per Se* by Defendant Prien

213.    Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

214.    Defendant Prien made defamatory statements about Plaintiff.

215.    Defendant Prien published these statements by communicating them to a third person.

216.    Statements made by Defendant Prien alleging academic misconduct and intellectual property theft by Plaintiff are false.

217.    Defendant Prien acted intentionally in making such statements.

218.    Defendant's statements concerned Plaintiff's profession and were so obviously harmful that damage to Plaintiff may be presumed.

### Count Twenty: Defamation *Per Se* by Defendant TTU

219.    Dr. Wells incorporates the paragraphs above as though copied verbatim herein.

220.    Defendant TTU made defamatory statements about Dr. Wells.

221.    Defendant TTU published these statements by communicating them in email to TTU employees and others.

222.    Statements made by TTU regarding academic misconduct and intellectual property theft are false.

223.    Defendant TTU acted intentionally in making such statements.

224.    Defendant TTU's statements concerned Plaintiff's profession and integrity and were so obviously harmful that damage to Plaintiff may be presumed.

## VIII.
## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues of fact to which she is entitled to a jury trial in this action.

## IX.
## PRAYER

For all the foregoing reasons, Plaintiff requests that the Court enter judgment in her favor and award her the following relief against Defendants:

a. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all harm, including but not limited to, compensation for emotional distress, suffering, inconvenience, mental anguish, reputational harm, loss of enjoyment of life, and special damages;

b. An order that Defendants disgorge all profits obtained as a result of their wrongful conduct;

c. An order that Defendants correct authorship of all publications at-issue to include Dr. Wells as a co-author;

d.  An order that the Director of the United States Patent and Trademark Office correct the inventorship of the '064 patent to name Dr. Wells as a joint inventor to the individuals currently listed as inventors on the '064 patent;

e.  Alternatively, an order that Defendants sign the requisite documents to correct inventorship of the '064 patent to name Dr. Wells as a joint inventor on the '064 patent;

f.  Alternatively, an order that '064 patent is invalid or unenforceable due to improper inventorship;

g.  An award of punitive damages in an amount to be determined at trial;

h.  Liquidated damages;

i.  An award of attorneys' fees and costs;

j.  An award of costs of court;

k.  Any such other and further relief as the Court deems just and proper.

Dated: March 22, 2023              Respectfully submitted,

                                   **BREWER, ATTORNEYS & COUNSELORS**

                                   By: /s/ Ramon Hernandez
                                   Ramon Hernandez
                                   State Bar No. 24126896
                                   rxh@brewerattorneys.com
                                   1717 Main Street, Suite 5900
                                   Dallas, Texas 75201
                                   Telephone: (214) 653-4000
                                   Facsimile: (214) 653-1015

                                   **COUNSEL FOR PLAINTIFF CARA WESSELS WELLS**