UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

CARA WESSELS WELLS,

     Plaintiff,

v.

    No. 5:23-CV-060-H

TEXAS TECH UNIVERSITY, et al.,

     Defendants.

## <u>ORDER</u>

The plaintiff, Cara Wells, asserts fourteen disparate claims against Texas Tech and two professors, ranging from employment discrimination to patent invalidation to defamation per se, based on events during her time as a student at Texas Tech University and afterward. Before the Court are four motions to dismiss. Dkt. Nos. 15; 16; 24; 25. The individual defendants and Texas Tech each filed motions to dismiss (Dkt. Nos. 15; 16), which were then superseded by an amended complaint and subsequent motions. The Court denies these motions in part as moot but grants the motion to dismiss certain tort claims against the individual defendants because the defendants have a statutory right to such dismissal that accrued upon the filing of the original motion. *See* Dkt. No. 15 at 5. In their new motions to dismiss, the defendants seek dismissal of all claims. Dkt. Nos. 24; 25. The Court grants in full Texas Tech's motion to dismiss (Dkt. No. 24) and the individual defendants' motion to dismiss (Dkt. No. 25) and dismisses all of Wells's claims with prejudice. Wells's claims are not viable for a variety of reasons, including immunity bars, statute of limitations issues, or failure to plausibly allege the elements of the claims.

1.     **Factual and Procedural Background**

　　A.     **Factual Allegations[1]**

Wells's allegations span over a decade, beginning with her enrollment as an undergraduate student at Texas Tech to her time as a PhD student and concluding with her participation in a program designed to help start-up companies.  *See generally* Dkt. No. 19.  In 2009, Wells began her undergraduate studies at Texas Tech and took a course taught by Dr. Samuel Prien.  *Id.* ¶¶ 32–33.  Wells subsequently became a research assistant for Prien and worked in his lab where she met Dr. Lindsay Penrose, another Texas Tech professor.  *Id.* ¶¶ 34–37.  Wells asserts that Prien and Penrose made inappropriate and harassing comments towards her while she worked at the lab.  *See id.* ¶ 37.

　　Many of Wells's allegations center around the annual American Society for Reproductive Medicine (ASRM) meeting, a research conference.  *See, e.g., id.* ¶¶ 38–40, 44–45, 51–52, 57–58, 72, 96, 99–100.  Wells first attended the conference with Prien and Penrose in 2012 to present a research poster.  *Id.* ¶ 38.  She claims that Prien demanded that she share a hotel room with him and Penrose on the trip.  *Id.* ¶ 39.  And he also instructed her to wear jeans rather than business attire.  *Id.* ¶ 40.  Prien made similar comments on her attire and required Wells to share a room with him and Penrose at subsequent conferences.  *E.g., id.* ¶¶ 44–45, 51–52, 57–58.  Wells also alleges that Prien required other students, including male students, to share a hotel room with him on these research trips.  *Id.* ¶¶ 72, 81.  Wells asserts that these trips often involved harassment from Prien and Penrose, such as a "demeaning incident" in 2014 where "Dr. Penrose heated a cookie and then crumbled it

---

[1] These allegations are taken from Wells's amended complaint (Dkt. No. 19), which the Court accepts as true when resolving a motion to dismiss. *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016).

onto Dr. Wells [sic] bed while staring Dr. Wells in the eye" and Prien "did nothing to remedy or address" this incident. *E.g.*, *id.* ¶ 52.

While a PhD student, Wells continued to work in Prien's lab where she and the professors developed ideas that resulted in patent applications. *See id.* ¶¶ 47–50, 53, 76. Wells claims the original idea of one of those patents arose from a discussion she and Prien had about embryo buoyancy. *Id.* ¶¶ 50, 76. However, before the patent was awarded, Texas Tech "unilaterally removed [her] as an inventor" from the patent application. *Id.* ¶ 102. She also alleges that her portion of royalties for another patent is disproportionately lower than the professors' and that she was never included in a conversation about the apportionment. *Id.* ¶ 101. She also has "not receive[d] any royalties from [Texas Tech] for several patents." *Id.* ¶ 115.

Wells graduated with her PhD in 2017, though she "was so traumatized that she felt she could not walk at graduation." *Id.* ¶ 64. She then applied for jobs with Prien listed as a reference. *Id.* ¶ 65. Wells applied to numerous positions over six months and was unable to find work. *Id.* ¶ 66. She eventually spoke to Prien about this job search where he allegedly told her that he had "told [potential employers] that he could not recommend her for the job." *Id.* ¶¶ 66–67. She claims that Prien did this "so that she would have no choice but to return to an assistant's position in her lab." *Id.* ¶¶ 67–68. But Wells found other employment working as an andrologist. *Id.* ¶ 69.

During her time as an andrologist, "Wells began building her first company, Embryotics." *Id.* ¶ 71. Her new company brought her back to Texas Tech and Prien. *See id.* ¶¶ 74–75, 78. In 2018, she left her job as an andrologist to work on Embryotics full time and applied for the company to participate in Texas Tech's Accelerator program. *Id.* ¶¶ 77–

78.  The Accelerator program is "a year-long program that provides selected startup companies $25,000 and additional funding opportunities, monthly business trainings, marketing and business plan support, access to regional professional events, and a team of mentors from various industries in the venture space." *Id.* ¶ 78.  Embryotics was selected, and Wells added Prien to her team of mentors.  *Id.* ¶ 79.  Embryotics and Wells partnered with another company, Simplot, to conduct research.  *See id.* ¶¶ 81, 97.  As part of this arrangement, Embryotics executed a non-disclosure agreement with Simplot.  *Id.* ¶ 97.

Embryotics dissolved in 2019, and Wells formed a new company, EmGenisys.  *Id.* ¶¶ 82–83.  Wells again applied to have her company in the Accelerator program, EmGenisys was accepted, and Prien was added as a mentor.  *See id.* ¶¶ 85–86, 95–96.  With her new company, she sought to work with a livestock company, Vytelle, which executed a letter of intent "for a project that would build upon the technology" that Embryotics had been working on prior to its dissolution.  *Id.* ¶¶ 84–85.  But because the Embryotics technology had been developed at Texas Tech, EmGenisys could only use the technology with a license from the university.  *Id.* ¶ 85.  Once EmGenisys was accepted into the Accelerator program, Wells learned that Texas Tech licensed the technology to Vytelle and arranged for EmGenisys and Wells to work for Vytelle.  *Id.* ¶ 90.  Wells asserts that this arrangement was contrary to promises made to her and was driven by Prien and Penrose. *Id.* ¶¶ 88–90.  Wells later met with various university officials, including Penrose and Prien, in August 2019, to explain her position, but she was met with resistance.  *Id.* ¶¶ 93–94.

Nevertheless, EmGenisys remained in the Accelerator program, and Wells continued to include Prien in her research.  *Id.* ¶¶ 95–96.  She discussed her research with him, which Prien then allegedly used as part of an abstract for a presentation at the ASRM

conference. *Id.* ¶ 96. Wells worried that his presentation would harm her companies and would breach Embryotics's non-disclosure agreement with Simplot. *Id.* ¶ 97; *see also id.* ¶ 81. She also claims that his disclosure via the abstract violated his non-disclosure agreement with Texas Tech as a mentor. *Id.* ¶ 98. So she asked Prien to withdraw his presentation, and, when he refused, convinced the conference to remove his abstract due to his "misconduct and misappropriation." *Id.* ¶¶ 98–99.

In 2022, Wells became a mentor in the Accelerator program. *Id.* ¶ 108. She "under[went] rigorous interviews, background checks and onboarding procedures" prior to taking the position, and she was listed on Texas Tech's website. *Id.* ¶ 110. She hoped that the unpaid mentor position could later lead to a compensated one "by being hired in [a] full-time role[] at [Texas Tech] or by partnering with one of the companies accepted into the Accelerator Hub," like other mentors commonly did. *Id.* ¶ 111. But Wells's time as a mentor was short-lived and not well-received. *See id.* ¶ 112. Shortly after she started, "Prien wrote and distributed by email a song he titled the 'Time to Move on Song,' which does not directly name Dr. Wells, but is a clear reference to her." *Id.* ¶ 109. Then, Texas Tech's general counsel's office directed the program to remove Wells as a mentor. *Id.* ¶ 112. After Wells was removed, other mentors were told "to cease 'any formal relationship with and remove any and all collaboration with'" her. *Id.* Further, the mentors "were specifically instructed to 'no longer engage Dr. Wells in Hub programming or involve her in the fulfillment' of the [m]entorship roles." *Id.* She was also "removed from many [Texas Tech] publications, including articles honoring her as a distinguished alumnus [sic] and EmGenisys founder." *Id.* ¶ 114.

Wells does not allege that she formally complained of harassment during her time as a student.  Rather, she asserts that, at some unspecified point, she "emailed a student body representative asking for help to protect students from [Prien and Penrose's inappropriate conduct toward] powerless students."  *Id.* ¶ 105.  She also later told a mentor in the Accelerator program and the Managing Director of the Innovation Hub that Prien had "forc[ed] her to share a hotel room with him and Dr. Penrose on all of their [u]niversity-sponsored research trips."  *Id.*  In 2020, three years after her graduation, she told Dr. Mark Sheridan, the dean of the graduate school, that the university should "prevent students from sharing hotel rooms with professors" and that "students often are faced with unnecessary additional expense," such as research costs.  *Id.* ¶ 106.  She claims that other individuals at Texas Tech complained about Prien and Penrose and that those individuals filed their complaints with the university's human resources department.  *Id.* ¶ 107.

### B.    Procedural History

Based on these events, Wells filed a complaint asserting numerous claims against Texas Tech, Prien, and Penrose.  Dkt. No. 1.  The defendants filed motions to dismiss these claims, citing various deficiencies.  Dkt. Nos. 15; 16.  Of particular importance, "[Texas Tech] request[ed] the Court to dismiss [the p]laintiff's tort claims against the [i]ndividual [d]efendants, who are employees of [Texas Tech] pursuant to [Texas Civil Practice and Remedies Code S]ection 101.106."  Dkt. No. 15 at 5.

After these motions were filed, Wells amended her complaint (Dkt. No. 19), and the defendants filed new motions to dismiss (Dkt. Nos. 24; 25).  Wells's amended complaint asserts fourteen claims: (1) Title VII sexual harassment against Texas Tech; (2) Title VII hostile work environment against Texas Tech; (3) Title VII retaliation against Texas Tech;

– 6 –

(4) Title IX discrimination against Texas Tech, Prien, and Penrose; (5) Equal Protection

Clause violation against Prien and Penrose; (6) correction of inventorship against Prien and

Penrose; (7) patent invalidity against Prien and Penrose; (8) tortious interference with

contract against Prien; (9) trade secret misappropriation against Prien; (10) intentional

infliction of emotional distress against Prien and Penrose; (11) unjust enrichment against

Prien and Penrose; (12) breach of fiduciary duty against Prien and Penrose; (13) fraudulent

concealment against Prien and Penrose; and (14) defamation per se against Prien.  Dkt. No.

19 ¶¶ 118–217.  In response, the defendants assert that these claims are all fatally flawed in

light of their immunity to suit for some claims, statute of limitations bars, and insufficient

factual allegations.  *See* Dkt. Nos. 24; 25.  The amended complaint and the subsequent

motions to dismiss have mostly mooted the original motions to dismiss.  However, for at

least some of Wells's tort claims, by operation of Texas law, the original motions to dismiss

are still controlling.  *See* Section 3.D *infra*.  The motions are fully briefed and ripe for

resolution by the Court.

**2.    Motion to Dismiss Standard**

A complaint must contain "a short and plain statement of the claim showing that the

pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Therefore, a plaintiff must allege

sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its

face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  A plaintiff's claim "has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009).  This "plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully." *Id.* If a complaint pleads facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Defendants can challenge the sufficiency of a complaint through a motion to dismiss under Rule 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). In resolving a motion to dismiss, a court must "accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff." *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (cleaned up) (quoting *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010)). However, this tenet does not extend to legal conclusions. *Iqbal*, 556 U.S. at 678. Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## 3.    Analysis

The Court dismisses all of Wells's claims. Her Title VII claims are untimely, and she has not plausibly alleged deliberate indifference to any sex-based harassment or discrimination as necessary for a Title IX claim. Her patent claims are barred by sovereign immunity and are missing an indispensable defendant. Her tort claims are all asserted against the professors within the scope of their employment and therefore must be dismissed under Texas law. To the extent she is raising a statutory trade secret misappropriation claim, she has failed to plausibly allege that Prien misappropriated a trade secret that belonged to her. Finally, her equal protection claim is not cognizable against the professors in their official capacity because she has not alleged any ongoing violation of federal law. Accordingly, the Court grants in part the defendants' original motions to dismiss (Dkt. Nos.

15; 16) as to certain tort claims, denies in part as moot the other portions of the original motions, and grants in full the defendants' new motions to dismiss (Dkt. Nos. 24; 25).

### A.    Title VII Claims

Wells first asserts claims under Title VII against Texas Tech for sexual harassment, hostile work environment, and retaliation.  Dkt. No. 19 ¶¶ 118–40.  The Court dismisses these claims as time-barred because she did not file her EEOC charge within the 300-day limitations period.[2]

Title VII claims are subject to a mandatory claims-processing rule that requires a plaintiff to first administratively exhaust her claims before bringing a lawsuit.  *See* 42 U.S.C. § 2000e-5; *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002).  One aspect of this requirement is the employee must file a charge with the EEOC within 300 days after the unlawful employment practice occurred.  42 U.S.C. § 2000e-5(e)(1).  Wells filed her EEOC charge on November 11, 2022.  Dkt. No. 19 ¶ 30 & n.1.  However, she has not been an employee of Texas Tech since her PhD graduation in 2017.  *See id.* ¶¶ 67–117.  Accordingly, her EEOC charge was clearly filed more than 300 days after any unlawful employment practice occurred.  As a result, Wells failed to timely file a charge as required to properly administratively exhaust her claims.

Nevertheless, Wells argues that, despite not being formally employed, she was an "employee" of Texas Tech for purposes of Title VII when she volunteered as an unpaid

---

[2] The Court notes that Wells alleges only that she sought relief from the EEOC, not any authorized state agency, and that as a result, the 180-day limitations period would ordinarily apply.  42 U.S.C. § 2000e-5(e)(1); Dkt. No. 19 ¶ 30.  However, Texas Tech bases its motion to dismiss on the 300-day limitations period, claiming that Wells cross-filed her complaint with the Texas Workforce Commission.  *See* Dkt. No. 24 at 3–4.  In light of Texas Tech's own arguments and because Wells's claims are untimely under either limitations period, the Court applies the more generous statute of limitations for purposes of resolving the motions to dismiss.

mentor for the Accelerator program, and therefore her removal from serving as a mentor

was an adverse action.  Dkt. No. 35 at 3–5.  But Fifth Circuit precedent forecloses her

argument that an unpaid position counts as employment.  *See Juino v. Livingston Par. Fire

Dist. No. 5*, 717 F.3d 431, 439 (5th Cir. 2013).  To determine whether a non-traditional hire

may be classified as an "employee," the Fifth Circuit applies a two-step approach.  *Id.* at

434, 437, 439.  The first asks whether the putative employee received remuneration in the

form of "salary, wages, or significant indirect benefits that are not incidental to the service

performed."  *Id.* at 437, 439.  Only if the putative employee shows some remuneration may

a court proceed to the second step of the economic realities and common law agency test.

*Id.* at 434, 439.  Applying this test, the Fifth Circuit rejected the argument that a volunteer

firefighter who received some compensation, a life insurance policy, a uniform, and training

had shown sufficient renumeration.  *Id.*  Therefore, the firefighter was not covered by Title

VII.  *Id.* at 439–40.

      Here, Wells does not allege that she received a salary, wages, or significant indirect

benefit from her mentor position.  Dkt. No. 19 ¶¶ 108, 110–11.  Instead, she asserts that she

interviewed for the position, had the position listed on a Texas Tech website, and hoped

that she would be able to transform the position into a compensated position.  *Id.*  Her mere

hope of possible future remuneration is insufficient to show any significant benefits that are

not incidental to the position.  *See Juino*, 717 F.3d at 437, 439–40.  At best, her one-sided

expectation is an indirect benefit and is substantially less than the actual compensation and

insurance benefits that were found insufficient in *Juino*.  *See id.*  As a result, she has not

plausibly alleged that she was an employee of Texas Tech when she served as an unpaid

mentor, and 2017 remains her last relevant employment date for actionable harassment or

hostile work environment.  Accordingly, her 2022 EEOC charge—five years after her last date of employment with Texas Tech—was not timely filed.  *See* 42 U.S.C. § 2000e-5(e)(1).

Wells's retaliation claim fares no better.  True, former employees can fall within Title VII's protections against retaliation.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 339, 346 (1997).  But that is typically a principle to ensure that employees who are discharged in retaliation for their complaints are able to bring claims even though they are no longer a current employee, *see id.*, not to give someone who was once employed by a company a perpetual right of action for any unfavorable action that the company may take at some point in the future.  Consequently, a former employee fails to plausibly allege Title VII retaliation when she is sufficiently removed from the employment relationship because the alleged harm is so attenuated that it would not dissuade a reasonable worker from making a discrimination charge.  *See Allen v. Radio One of Tex. II, L.L.C.*, 515 F. App'x 295, 302 (5th Cir. 2013) (citing *Robinson*, 519 U.S. at 339).  In *Allen*, for example, the Fifth Circuit rejected the plaintiff's claim of retaliation when her former employer refused to do business with her new company, which occurred more than a year after her protected activity and 18 months after she was fired.  *Id.*  In contrast, retaliation by a former employer was actionable when the plaintiff asserted that he received a negative reference shortly after he was fired and had filed an EEOC charge.  *Robinson*, 519 U.S. at 339.

Here, given the 300-day limitations period and that Wells filed her EEOC charge on November 11, 2022, the only possibly actionable claims of retaliation would be those occurring on January 15, 2022, or later.  *See* 42 U.S.C. § 2000e-5(e)(1); Dkt. No. 19 ¶ 30 & n.1.  But Wells has not been a Texas Tech employee since 2017, and the only date provided by Wells for any possible complaint by her of inappropriate actions is "fall 2020," more than

a year earlier.  *See* Dkt. No. 19 ¶ 106.  Such claims of adverse actions that occurred roughly

five years after her last date of employment—and over a year after any complaints about

impropriety—are simply too attenuated from her employment relationship to state a Title

VII claim.  *See Allen*, 515 F. App'x at 302–03; *see* Dkt. No. 19 ¶¶ 105–06, 112.  No

reasonable worker would refuse to make or support a discrimination charge because, several

years later, after initially leaving her employment on her own terms, she may be removed

from an unpaid position by the former employer.  Even if this could be actionable, she

provides no factual allegations to allow a plausible inference that she was removed from the

mentor program or blacklisted from the mentor committee in retaliation for any protected

activity.  *See* Dkt. No. 19 ¶ 112.  And the extended amount of time between any protected

activity and her removal "present[s] too attenuated a time frame for legal causation."  *Allen*,

515 F. App'x at 303 (finding a year between the EEOC charge and the adverse action to be

too removed).

     In light of these deficiencies, the Court dismisses Well's Title VII claims.

### B.  Title IX Claims

     Wells next asserts a Title IX claim against Texas Tech and the professors.  These

claims are dismissed because the professors cannot be liable under Title IX, and Wells has

not plausibly alleged deliberate indifference by Texas Tech.

     Title IX prohibits intentional sex discrimination "under any education program or

activity receiving [f]ederal financial assistance."  20 U.S.C. § 1681(a); *Doe v. Edgewood Indep.

Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020).  It imposes liability only against an

institution—not school officials, professors, or other individuals.  *Fitzgerald v. Barnstable Sch.*

*Comm.*, 555 U.S. 246, 257 (2009).  Accordingly, her Title IX claim against the individual professors must be dismissed.

Wells's Title IX claim against Texas Tech presents numerous problems.  For one, Title IX is governed by a state statute of limitations for personal injury, so Wells's claim is subject to Texas's two-year statute of limitations.  *See King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 759–60 (5th Cir. 2015).  Moreover, Title IX generally contains an implied private right of action for students challenging sex-based discrimination in an education program, rather than a general right of action for anyone interacting with a university.  *See, e.g., Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247–48 (5th Cir. 1997); *Lakoski v. James*, 66 F.3d 751, 754 (5th Cir. 1995).[3]  Many of Wells's allegations fall outside of the two-year window, and she has not been a Texas Tech student since 2017.  *See generally* Dkt. No. 19.  Wells does not address this problem in her briefing, instead arguing that her "employment" as a mentor makes her claims within the two-year period.  Dkt. No. 35 at 6.  Besides the fact that she was not an employee as previously explained, *see* Section 3.A *supra*, it is unclear what relevance that could possibly have for her Title IX claims.  Employees do not have a private right of action under Title IX for discrimination unless they are asserting a retaliation claim for reporting a Title IX violation, which is not at issue here.  *See Lowrey*, 117 F.3d at 247–48; *Lakoski*, 66 F.3d at 754; Dkt. No. 19 ¶¶ 141–49.  Moreover, even if she could possibly have a claim as a non-student, besides a conclusory statement, she does not explain how removing her name from news articles on Texas Tech's website, from her role as a mentor, or instructing people to stop contacting her constituted denying her the benefits

---

[3] *See also Doe v. Brown Univ.*, 270 F. Supp. 3d 556, 561–62 (D.R.I. 2017); *K.T. v. Culver-Stockton Coll.*, No. 4:16-CV-165 CAS, 2016 WL 4243965, at *6 (E.D. Mo. Aug. 11, 2016); *Lopez v. San Luis Valley, Bd. of Coop. Educ. Servs.*, 977 F. Supp. 1422, 1425–26 (D. Colo. 1997).

of an education program.  *See* Dkt. No. ¶¶ 112, 114, 144, 146.  To the extent that the
Accelerator program could fall within the scope of Title IX, Wells's own allegations are that
she was removed from her role as a mentor, not a participant or beneficiary of the program.
*See* Dkt. No. ¶¶ 108, 112.  It is unclear what possible educational benefits she was receiving
in that position.  Accordingly, her complaint does not appear to plausibly allege that she
falls under Title IX's protections.

      Beyond these roadblocks, assuming arguendo that any of her allegations were
actionable under Title IX, she has failed to plausibly allege a claim for relief.  A university is
not liable unless it had actual notice of the discrimination given to an appropriate official
and responded with deliberate indifference.  *Doe*, 964 F.3d at 358–59.  An appropriate
official is someone with "authority to both 'repudiate th[e] conduct *and* eliminate the hostile
environment.'"  *Id.* at 360 (emphasis and alteration in original) (quoting *Rosa H. v. San
Elizario Indep. Sch. Dist.*, 106 F.3d 648, 661 (5th Cir. 1997)).  And this notice must inform the
official of the sex-based discrimination or harassment.  *Id.* at 364.

      Wells has not plausibly alleged that such notice was given.  She argues that her
conversation with Sheridan, the dean of the graduate school, in fall 2020 provided this
notice.  *See* Dkt. No. 35 at 9.  Putting aside the clear statute of limitations problem, her
factual allegations as to what she told Sheridan do not include any statements about her
experiencing sex-based discrimination.  *See* Dkt. No. 19 ¶ 106.  Instead, she told Sheridan
that she thought the university should "prevent students from sharing hotel rooms with
professors" and that "students often are faced with unnecessary additional expense," such as
having to fund their own research.  *Id.*  None of that includes any notice that she was
experiencing sexual harassment or sex-based discrimination.  And to the extent she tries to

rely on complaints by other students, she does not explain how that put Texas Tech on notice that she was experiencing sex-based discrimination. *Id.*; *see also Doe*, 964 F.3d at 364. Further, while Wells seems to argue that she did not need to provide any notice to an appropriate official for some of her claims because they were perpetuated by "high ranking officials," Dkt. No. 35 at 9, the actual notice requirement applies unless an official policy of sex-based discrimination is alleged. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). She does not allege any such policy nor did her amended complaint indicate that her Title IX claim was based on the actions of these "high ranking officials." Dkt. No. 19 ¶¶ 141–49 (alleging that "Dr. Prien and Dr. Penrose carried out the harassment"). In light of the foregoing, Wells's Title IX claim fails as a matter of law and is dismissed.

### C.    Patent Claims

Wells next asserts claims for correction of inventorship and a declaration of patent invalidity against Prien and Penrose. *Id.* ¶¶ 160–68. She seeks to have the Court direct the Patent and Trademark Office to include her as a listed inventor for U.S. Patent No. 11,169,064, or alternatively to declare that the patent is invalid because she was knowingly and deceptively removed as an inventor. *Id.* The defendants argue that these claims should be dismissed because they are barred by sovereign immunity, and Texas Tech is an indispensable party to any resolution of the patent claims because it owns the patent. Dkt. Nos. 25 at 12–14; 37 at 3–6. Wells argues that her claims are brought under the *Ex parte Young* doctrine and are not barred because they seek prospective relief. Dkt. No. 34 at 6. The Court dismisses these claims because (1) Prien and Penrose are not proper defendants under the *Ex parte Young* doctrine; and (2) even if they were, Texas Tech is an indispensable

– 15 –

party to any claim implicating the validity of the patent, and its absence as a defendant to these claims requires dismissal.

As a general matter, Texas Tech has sovereign immunity as an agency of Texas from private suits. *Pickett v. Tex. Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1025 (5th Cir. 2022). When sued in their official capacity, Prien and Penrose are treated like Texas Tech itself and therefore such claims are barred against them unless sovereign immunity is waived. *Id.* And while 35 U.S.C. § 296(a) purports to abrogate a state's sovereign immunity for violations of federal patent laws, the Supreme Court has held that such waiver is unconstitutional. *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 647–48 (1999). Accordingly, Texas Tech—and, by extension, Prien and Penrose—are cloaked with sovereign immunity for Wells's patent claims. *See Xechem Int'l, Inc. v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 382 F.3d 1324, 1332 (Fed. Cir. 2004) (applying sovereign immunity to a correction of inventorship claim).

However, the *Ex parte Young* doctrine provides an exception to this principle by permitting a plaintiff to seek injunctive or declaratory relief against a state official who is violating federal law. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019); *see Ex parte Young*, 209 U.S. 123, 155–57 (1908). Importantly, an *Ex parte Young* claim may only be maintained against a state official who "by virtue of his office has some connection with the enforcement of the challenged act, or else the suit is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *City of Austin*, 943 F.3d at 997 (cleaned up) (quoting *Ex parte Young*, 209 U.S. at 157). This "requires some scintilla of 'enforcement' by the relevant state official," such as "compulsion or constraint" of the plaintiff. *Id.* at 1002.

– 16 –

Here, Wells has failed to plead any facts establishing that Prien and Penrose have any connection to the claimed ongoing violation of federal law. *See* Dkt. No. 19 ¶¶ 102, 160–68. Instead, she alleges that "the University, through its attorney Kristopher Lance Anderson, unilaterally removed Dr. Wells as an inventor from [the patent application]," resulting in her omission as a listed inventor. *Id.* ¶ 102. She does not explain what future action Prien and Penrose are significantly likely to take that would constitute a violation against Wells. Nor does she provide any examples of activities in her response to the motion to dismiss. *See* Dkt. No. 34 at 6. The complaint provides no basis to plausibly infer that Prien and Penrose have "some scintilla of 'enforcement'" regarding Wells's cited violations of patent law, and therefore they are not susceptible to an *Ex parte Young* claim. *See City of Austin*, 943 F.3d at 1002; *see also Pennington Seed, Inc. v. Produce Exch. No. 299*, 457 F.3d 1334, 1342–43 (Fed. Cir. 2006) (dismissing an *Ex parte Young* claim because "[a]llegations that a state official directs a University's patent policy are insufficient to causally connect that state official to a violation of federal patent law").

Moreover, even if Prien and Penrose were proper defendants, Wells's patent claims cannot be maintained without Texas Tech as a party to these claims. And because Texas Tech is immune from suit, it cannot be added as a party here and her claims must be dismissed regardless. As the defendants note, Texas Tech owns the patent at issue and is, therefore, a necessary party to this litigation. *See* U.S. Patent No. 11,169,064 (filed Nov. 9, 2021), at [73][4]; Dkt. Nos. 25 at 13; 37 at 6. Given that "[t]he validity of a patent requires

---

[4] In resolving a Rule 12(b)(6) motion, the Court may consider matters of which it can take judicial notice. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996). "Courts routinely take judicial notice of patents, prosecution history, and patent applications," as such information is

that the inventors be correctly named," any "part[y] with an economic stake in a patent's validity [is] entitled to be heard on inventorship issues once a putative inventor has sued to correct inventorship." *Chou v. Univ. of Chi.*, 254 F.3d 1347, 1359 (Fed. Cir. 2001); *see also* 35 U.S.C. § 256 (noting that a court "may order correction of the patent on notice and hearing of all parties concerned"). And clearly Wells's alternative request for invalidation of the patent would implicate Texas Tech's ownership interest. Because Texas Tech has an interest in the patent and resolving these claims in its absence "may as a practical matter impair or impeded [its] ability to protect the interest," it must be joined to these claims. *See* Fed. R. Civ. P. 19(a)(1)(B); *Lee v. Anthony Lawrence Collection, L.L.C.*, 47 F.4th 262, 266–67 (5th Cir. 2022).

However, in light of Texas Tech's sovereign immunity, it cannot be joined as a defendant to these claims. *See Lee*, 47 F.4th at 267–68; *Gensetix, Inc. v. Bd. of Regents of Univ. of Tex. Sys.*, 966 F.3d 1316, 1323 (Fed. Cir. 2020). When a party "who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). While this determination typically involves considering four factors, *see id.*, the Fifth Circuit has instructed that a state's sovereign immunity is a substantial interest that is alone "enough to require dismissal of the action because there is a potential for injury to the university's interest as the absent sovereign." *Lee*, 47 F.4th at 268 (cleaned

---

available as part of the public record on the Patent and Trademark Office's database. *See, e.g.*, *SB IP Holdings, LLC v. Vivint Smart Home, Inc.*, No. 4:20-cv-886, 2021 WL 1721715, at *1 (E.D. Tex. Apr. 30, 2021); *Vervain, LLC v. Micron Tech., Inc.*, No. 6:21-cv-487-ADA, 2022 WL 23469, at *5 n.2 (W.D. Tex. Jan. 3, 2022); *Jenny Yoo Collection, Inc. v. Watters Design, Inc.*, No. 3:17-cv-3197-M, 2018 WL 3330025, at *5 n.8 (N.D. Tex. June 6, 2018). Accordingly, the Court takes judicial notice of the patent.

up) (quoting *Republic of Philippines v. Pimental*, 553 U.S. 865, 867 (2008)).[5]  Sovereign immunity justifies such dismissal because this "sovereign interest is necessarily impaired when plaintiffs try to use the state's sovereign immunity to lure it into a lawsuit against its will."  *Id.* at 267.

The present case exemplifies this problem.  If these claims proceeded without Texas Tech, it would have to choose between waiving its sovereign immunity by moving to be joined as a defendant or having other defendants who do not own the patent defend its validity.  While the professors may take a similar stance as the university would if forced to defend the claims, their interests are not identical because only Texas Tech has ownership of the patent.  *See id.* at 269.  Accordingly, to adequately protect its interest in the patent's validity, Texas Tech would be forced to waive its immunity against its will.  Thus, "in the interest of 'equity and good conscience,'" Wells's patent claims must be dismissed.  *See id.* at 268.

### D.    Tort Claims

Wells next raises several tort claims against Prien and Penrose.  Specifically, she asserts claims of intentional infliction of emotional distress, unjust enrichment, breach of fiduciary duty, and fraudulent concealment against both Prien and Penrose.  Dkt. No. 19 ¶¶ 180–210.  She also alleges claims of tortious interference with contractual relations, trade secret misappropriation, and defamation per se against Prien.  *Id.* ¶¶ 169–79; 211–17.  The

---

[5] Even in patent cases, Rule 19 is analyzed under the law of the regional circuit. *Univ. of Utah v. Max-Planck-Gesellschaft Zur Forderung Der Wissenschaften E.V.*, 734 F.3d 1315, 1320 (Fed. Cir. 2013). Accordingly, this Court is bound by the Fifth Circuit's adoption of the controlling weight of a state's sovereign immunity in the Rule 19(b) analysis, rather than the Federal Circuit's contrary conclusion in *Gensetix, Inc.  Compare Lee*, 47 F.4th at 267–68, *with Gensetix, Inc.*, 966 F.3d at 1325–27.

defendants argue that all of these claims are subject to dismissal under the Texas Tort Claims Act because these claims are within their general scope of employment with Texas Tech.[6]  *See* Dkt. No. 25 at 9–11; Tex. Civ. Prac. & Rem. Code § 101.106.

The Court dismisses these claims.  First, her claims of intentional infliction of emotional distress, fraudulent concealment, and defamation per se are subject to mandatory dismissal.  She made an irrevocable decision to sue them in their official capacities by raising such claims against both them and Texas Tech in her original complaint, and Texas Tech requested dismissal of these claims in the original motions to dismiss.  *See* Dkt. Nos. 1 ¶¶ 180–86, 200–08, 213–24; 15 at 5.  Upon the filing of that motion, those tort claims against the individual defendants were subject to immediate dismissal, and Wells's attempts to undo that election to avoid dismissal are futile.  Second, as for the other tort claims, they arise from conduct within the scope of the professors' employment and, therefore, the professors are immune from suit.

### i.    Wells's claims against the professors for intentional infliction of emotional distress, fraudulent concealment, and defamation per se are subject to mandatory dismissal.

When a plaintiff seeks to bring a tort claim against a Texas governmental entity or its employees, she must proceed with caution in light of the Texas Tort Claims Act's (TTCA) election of remedies provision.  Specifically, Section 101.106 requires a plaintiff to "decide *at the outset*" before filing her complaint "whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable."  *Univ. of Tex. Health Sci. Ctr. at Hous. v. Rios*, 542

---

[6] Texas law governs Wells's various tort claims because "[a] federal court exercising pendent jurisdiction over state law claims[] must apply the substantive law of the state in which it sits." *Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan*, 883 F.2d 345, 353 (5th Cir. 1989).

S.W.3d 530, 536 (Tex. 2017) (emphasis in original) (quoting *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008)); *see* Tex. Civ. Prac. & Rem. Code § 101.106. In other words, a plaintiff cannot raise both alternative theories that an employee acted within the scope of employment or instead beyond that scope. *Rios*, 542 S.W.3d at 536. And this selection of tort theory—independent action or scope of employment—is "an irrevocable election *at the time suit is filed*." *Id.* (emphasis in original) (quoting *Garcia*, 253 S.W.3d at 657). Once the plaintiff files her complaint, under Texas law, she is bound by that choice even if she subsequently amends her complaint. *See id.* at 537; *McLemee v. Van Zandt County*, No. 6:20-CV-420, 2021 WL 2535945, at *3 (E.D. Tex. June 21, 2021).

One major consequence of Section 101.106 arises when a plaintiff seeks to sue both the governmental entity and the employees. Bringing the same claim against both parties acts as "an election to sue only the government." *Rios*, 542 S.W.3d at 537. So, under Section 101.106(e), "[i]f a suit is filed under [the TTCA] against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." Tex. Civ. Prac. & Rem. Code § 101.106(e). And once such a motion is filed, the individual defendants' statutory right to dismissal of those tort claims is perfected and cannot be undone by a subsequent amended pleading. *Rios*, 542 S.W.3d at 537–38; *McLemee*, 2021 WL 2535945, at *3. Accordingly, a plaintiff cannot simply drop her claims against the governmental entity after Section 101.106(e) is asserted and proceed with her claims solely against the employees. *Rios*, 542 S.W.3d at 537–38. Nor can she then amend her pleading to claim that the individual employees acted outside the scope of their employment. *McLemee*, 2021 WL 2535945, at *3. Instead, once a motion asserting the right to dismissal under Section 101.106(e) is raised, the individual employees

become immune from suit as to the relevant claims, and no subsequent pleading can remove that protection. *Rios*, 542 S.W.3d at 537–38.

Here, Wells's original complaint asserted her claims of intentional infliction of emotional distress, fraudulent concealment, and defamation per se against both the individual defendants and Texas Tech. Dkt. No. 1 ¶¶ 180–86, 200–08, 213–24. This constituted her "irrevocable election" to proceed with these claims against the individual professors in their official capacity. *See Rios*, 542 S.W.3d at 536–37 (quotation omitted); *McLemee*, 2021 WL 2535945, at *3. And pursuant to Section 101.106(e), "[Texas Tech] request[ed] the Court . . . dismiss [her] tort claims against the [i]ndividual [d]efendants, who are employees of [Texas Tech]." Dkt. No. 15 at 5. While Wells has since amended her complaint to remove Texas Tech as a defendant for these claims and to cursorily allege that these claims arise from actions "outside the scope of [the professors'] authority," *see* Dkt. No. 19 ¶¶ 185, 209, 217, "Texas law forbids such maneuvering." *Arismendez v. Coastal Bend Coll.*, No. 2:19-CV-312, 2020 WL 977231, at *4 (S.D. Tex. Feb. 27, 2020) (citing *Rios*, 542 S.W.3d at 538). Upon Texas Tech's confirmation of the professors' status as employees and invocation of Section 101.106(e), *see* Dkt. No. 15 at 5, the professors "accrued their right to dismissal," and Wells "[cannot] avoid this result by amending [her] petition to drop the tort claims against [Texas Tech]." *Rios*, 542 S.W.3d at 538.

Wells does not argue that Section 101.106 or its irrevocable-election principle are procedural rules rather than substantive rules such that they would not apply in federal court. *See* Dkt. No. 34 at 3–5; *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (noting that "federal courts are to apply state substantive law and federal procedural law" when resolving state law claims). Nevertheless, even if she had raised such an argument, the

– 22 –

Court concludes that these rules apply in federal court. Several federal courts in Texas have previously dismissed TTCA claims even when the plaintiff later amended the complaint to drop the claims against the governmental entity or alternatively have found amendment to be futile based on the reasoning of *Rios*. *E.g.*, *Arismendez*, 2020 WL 977231, at *4; *McLemee*, 2021 WL 2535945, at *3; *Silguero ex rel. T.S. v. Rio Hondo Indep. Sch.*, No. 1:18–CV-128, 2019 WL 13261515, at *5-6 (S.D. Tex. Jan. 2, 2019); *see also Vardeman v. City of Houston*, No. H-20-3242, 2022 WL 267591, at *1 n.1 (S.D. Tex. Jan. 28, 2022), *aff'd in part and rev'd in part on other grounds by* 55 F.4th 1045 (5th Cir. 2022). This Court agrees. Texas's irrevocable-election principle is a substantive rule that is outcome-determinative and would undermine the twin aims of the *Erie* doctrine if not applied in federal court.

At first blush, Section 101.106's irrevocable-election principle and its resulting nullification of subsequent efforts to amend may seem to sound in procedure, particularly as the Federal Rules of Civil Procedure address amending pleadings and direct a court to "freely give leave [to amend] when justice so requires." *See* Fed. R. Civ. P. 15(a). And in federal court, "[a]n amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading," so a plaintiff generally can adopt a new legal theory or alter a previous one, at least at an early stage in the proceedings. *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); *Mayeaux v. La. Health Sci. & Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004). In contrast, Section 101.106 creates a strict requirement that a plaintiff must carefully make a final decision prior to filing as to her selected tort liability theory, limiting her ability to cure certain deficiencies through amendment. *See Rios*, 542 S.W.3d at 536–38.

But simply because the rule relates to pleadings and amendments does not dictate that it is procedural under *Erie*. *See Hanna*, 380 U.S. at 465–66. For one, Section 101.106 does not actually prohibit a plaintiff from amending her complaint nor does it alter the procedures surrounding amendment; it simply prevents an amendment from nullifying an employee's statutory right to dismissal based on immunity. *See Rios*, 542 S.W.3d at 537–38. It therefore does not conflict with the Federal Rules of Civil Procedure themselves, though it does conflict with the standard federal principle of the impact of amended pleadings. *See Dogan*, 31 F.3d at 346. So this is not a case where the state law automatically does not apply because a valid "Federal Rule of Civil Procedure answers the same question as the state law or rule." *Klocke v. Watson*, 936 F.3d 240, 244 (5th Cir. 2019) (cleaned up) (quoting *Abbas v. Foreign Policy Grp.*, 783 F.3d 1328, 1333 (D.C. Cir. 2015)).

Instead, the Court must consider whether the irrevocable-election rule would implicate the "twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna*, 380 U.S. at 468 (emphasis added); *Walker v. Armco Steel Corp.*, 446 U.S. 740, 745, 752–53 (1980). Ultimately, this analysis is rooted in the belief that it is unfair for the result of a lawsuit to materially differ because it was brought in federal court. *Hanna*, 380 U.S. at 467. If Section 101.106's irrevocable-election principle did not apply in federal court, such material differences in litigation between a TTCA claim in state and federal court would arise. *See id.* As *Rios* demonstrates, it is indisputable that Wells's claims of intentional infliction of emotional distress, fraudulent concealment, and defamation per se would be permanently barred against the professors based on her election in her original complaint. *See Rios*, 542 S.W.2d at 536–38. Her decision to bring the claims based on their official capacity would shield them from the

costs and burdens of litigation by making them immune from suit, and this protection could not be removed by subsequent attempts to amend after the proper Section 101.106(e) dismissal request is made. *Id.* However, without this rule, the professors—or other similar government employees—would have to address dueling theories of liability or at least the possibility that a plaintiff would rethink the initial tort theory after dismissal is sought.

The defendants' inability to obtain the immunity to which they would be entitled in state court is a substantial consequence that would result in inequitable administration of the laws, which leads the Court to apply Section 101.106's irrevocable-election requirement. *See Walker*, 446 U.S. at 753. Given the sovereign immunity overlay to the TTCA, permitting such claims to proceed in federal court would be particularly harmful. After all, the TTCA does not waive Texas's sovereign immunity to suit in federal court. *Sherwinski v. Peterson*, 98 F.3d 849, 852 (5th Cir. 1996). So TTCA claims against Texas, its subcomponents, and its employees in their official capacity are subject to dismissal in federal court. *See id.* at 851–52. Accordingly, allowing these amendments to evade Section 101.106(e) dismissal despite a plaintiff's previous indication that the claims at issue are truly against Texas would allow further litigation in the very forum where Texas and its employees generally have no obligation to respond to such claims. *See Rios*, 542 S.W.3d at 536–37; *Sherwinski*, 98 F.3d at 851–52. Even in state court, the only immunity waiver applicable to official-capacity claims applies when they are asserted against the employer— an employee may assert his immunity and require dismissal or substitution of his employer, or, as here, the employer may demand dismissal of the claims against its employees. *See Sherwinski*, 98 F.3d at 851–52; Tex. Civ. Prac. & Rem. Code §§ 101.102, 101.106. It would be inequitable to deny immunity that a government employee would have in state court

when the state court is ordinarily the only forum where sovereign immunity as to these claims is partially waived. And it would improperly "give [the cause of action] longer life in the federal court than it would have had in state court." *Walker*, 446 U.S. at 746 (alteration in original) (quoting *Ragan v. Merchs. Transfer & Warehouse Co.*, 337 U.S. 530, 533–34 (1949)). In state court, these tort claims against the professors in their individual capacity would have been forfeited upon filing of the original complaint. The mere fortuity of being in federal court should not resurrect these claims.

Accordingly, this Court follows the trend of other federal district courts in Texas and applies the irrevocable-election rule. *See Arismendez*, 2020 WL 977231, at *4; *McLemee*, 2021 WL 2535945, at *3; *Silguero ex rel. T.S.*, 2019 WL 13261515, at *5-6; *Vardeman*, 2022 WL 267591, at *1 n.1. Consequently, Wells's original pleading of these claims against both the defendants and Texas Tech signified that she brought them in their official capacity and made them subject to dismissal under Section 101.106(e). Texas Tech sought such dismissal, Dkt. No. 15 at 5, and her subsequent amendment is futile because she cannot alter her irrevocable election made at the time she filed this case. *Rios*, 542 S.W.3d at 536–38. The Court therefore dismisses the claims of intentional infliction of emotional distress, fraudulent concealment, and defamation per se against the individual defendants pursuant to the Section 101.106(e) dismissal request made in the original motions to dismiss. *See* Dkt. No. 15 at 5.

### ii. Wells's other tort claims—unjust enrichment, breach of fiduciary duty, trade secret misappropriation, and tortious interference with contractual relations—must also be dismissed.

Wells also asserts four additional tort claims against the professors: tortious interference and trade secret misappropriation against Prien; and unjust enrichment and

breach of fiduciary duty against Prien and Penrose. Dkt. No. 19 ¶¶ 169–79, 188–210. To the extent these claims are not subject to dismissal under Section 101.106(e), they are dismissed under Section 101.106(f).

First, as to subsection (e), while these claims were not clearly alleged against Texas Tech in the original complaint, Dkt. No. 1 ¶¶ 167–74, 187–94, they are still barred under the irrevocable election to the extent they arise from "the same subject matter as the action brought against the governmental entity." *Williams v. Bolin*, No. H-23-302, --- F. Supp. 3d. ----, 2023 WL 6282834, at *8–9 (S.D. Tex. Sept. 26, 2023) (quoting *Holland v. City of Houston*, 41 F. Supp. 2d 678, 717 (S.D. Tex. 1999)); *White v. Texas*, No. 4:23-cv-925-P, 2023 WL 8074126, at *8 (N.D. Tex. Nov. 21, 2023) (citing *Goodman v. Harris County*, 571 F.3d 388, 394 (5th Cir. 2009)), *appeal filed*, No. 23-11190 (5th Cir. Nov. 27, 2023). Thus, even if these specific claims were brought only against the professors, any aspect of these claims that rely on the same substantive facts as those tort claims originally brought against Texas Tech are also subject to dismissal under Section 101.106(e).[7] *See White*, 2023 WL 8074126, at *8; *Rios*, 542 S.W.3d at 536–38; Dkt. No. 15 at 5.

---

[7] Wells's original unjust enrichment and breach of fiduciary duty claims are particularly unclear as to their original basis and original defendants. *See* Dkt. No. 1 ¶¶ 187–99. For the unjust enrichment claim, she refers to "[d]efendants" generally rather than specifying who "knowingly accepted the benefit" at issue. *Id.* ¶¶ 187–90. Given that this claim pertains the patent and its royalties, Texas Tech's ownership of the patent and the inclusion of Texas Tech in the original patent claims suggests that Texas Tech was originally a defendant as to this claim. *See id.* ¶¶ 160–66, 187–90. Wells also asserted breach of fiduciary duty claims against both Texas Tech and the professors. *Id.* ¶¶ 191–99. Given that the fiduciary duties claimed to be owed to Wells result from different relationships, these could conceivably arise from separate events. *See id.* But Wells's claim lacks any specification as to the particular facts at issue, creating a substantial likelihood that the substantive facts for both claims arise from the same subject matter. Moreover, these claims appear to be substantially related to the fraudulent concealment claims. *See id.* ¶¶ 187–210; Dkt. No. 19 ¶¶ 200–08. The Court need not parse these claims further because these claims are barred by other portions of Section 101.106 regardless of whether subsection (e) applies.

Second, "[i]f a suit is filed against an employee of a government unit based on conduct within the general scope of that employee's employment and if it could have been brought under [the TTCA] against the government unit, the suit is considered to be against the employee in the employee's official capacity only." Tex. Civ. Prac. & Rem. Code § 101.106(f). This provision is a corollary to subsection (e): it requires dismissal of the claims against the employee and of the claims altogether unless the governmental entity is made a defendant. *See id.*; *Franka v. Velasquez*, 332 S.W.3d 367, 380 (Tex. 2011). This provision favors "quickly dismiss[ing] government employees when the suit should be brought against their employer," and the Section 101.106 inquiry must avoid "partial litigation of the underlying [tort] claim itself." *Laverie v. Wetherbe*, 517 S.W.3d 748, 755 (Tex. 2017).

Section 101.106(f)'s application is broad: its "two conditions are met in almost every negligence suit against a government employee." *Franka*, 332 S.W.3d at 381. All claims "in tort and not under another statute that independently waives immunity" are claims that "could have been brought under" the TTCA, even if the TTCA does not waive immunity against the governmental entity. *See id.*; *Garcia*, 253 S.W.3d at 659–60; Tex. Civ. Prac. & Rem. Code § 101.106(f). Thus, though a plaintiff cannot use the TTCA to bring an intentional tort claim against the governmental entity, such intentional tort claims still are "under" the TTCA for purposes of Section 101.106. *Garcia*, 253 S.W.3d at 658–69; *see also* Tex. Civ. Prac. & Rem. Code. § 101.057. And "the scope-of-employment inquiry under Section 101.106(f) focuses on whether the employee was doing his job," asking only whether "a connection exists between the employee's job duties and the alleged tortious

conduct." *Garza v. Harrison*, 574 S.W.3d 389, 394 (Tex. 2019) (cleaned up) (quoting *Laverie*, 517 S.W.3d at 753).

Importantly, an employee does not need to have the specific authority to commit the tort at issue so long as he was generally discharging assigned duties. *Richardson v. Univ. of Tex. Sys.*, No. 5-19-CV-271-XR, 2019 WL 5306782, at *3 (W.D. Tex. Oct. 18, 2019); *see also City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 & n.9 (Tex. 1994). And the mere fact that "an official's act is unlawful does not determine whether that act is within the scope of his employment." *Smith v. Heap*, 31 F.4th 905, 914 (5th Cir. 2022). So a claim that the official "stepped outside of his official duties by engaging in malicious conduct" does not remove Section 101.106(f)'s immunity. *Id.* (cleaned up). Moreover, the mere fact that personal motives played a role in the employee's decision does not mean that he acted outside the scope of his employment. *Anderson v. Bessman*, 365 S.W.3d 119, 126 (Tex. App.—Houston [1st Dist.] 2011, no pet.). In other words, "the employee's state of mind, motives, and competency are irrelevant so long as the conduct itself was pursuant to the employee's job responsibilities." *Garza*, 574 S.W.3d at 401. Ultimately, so long as the acts are "of the same *general nature* as the conduct authorized or incidental to the conduct authorized," they are within the scope of employment. *Wilkerson v. Univ. of N. Tex.*, 878 F.3d 147, 159 (5th Cir. 2017) (emphasis in original) (quoting *Laverie*, 517 S.W.3d at 753).

It is undisputed that Prien and Penrose are government employees and that all of these tort claims could have been brought under the TTCA against Texas Tech. *See* Dkt. Nos. 19 ¶¶ 18–19; 34 at 3–5; *Franka*, 332 S.W.3d at 381; *Garcia*, 253 S.W.3d at 659–60. The sole issue is whether they were acting within the scope of their employment when this allegedly tortious conduct occurred. *See* Dkt. Nos. 25 at 9–11; 34 at 3–5. The Court

concludes that they were, and, as a result, dismisses these claims pursuant to Section 101.106(f).

As a preliminary matter, Wells appears to be under the mistaken belief that her own factual allegations are an insufficient basis to apply Section 101.106 and instead the defendants must provide summary judgment evidence for immunity to apply. *See* Dkt. No. 34 at 4. But courts routinely resolve such Section 101.106 immunity claims in favor of governmental employees based solely on the complaint's allegations. *E.g., Smith*, 31 F.4th at 910, 913–14; *Jackson v. Tex. S. Univ.*, 31 F. Supp. 3d 884, 886, 888–89 (S.D. Tex. 2014); *Wheeler v. Law Off. of Frank Powell*, No. 01-22-479-CV, 2023 WL 5535670, at *2–3, 10–11 (Tex. App.—Houston [1st Dist.] Aug. 29, 2023). If the facts alleged giving rise to the claim show that the conduct at issue is connected to the employee's job responsibilities, Section 101.106(f) applies and requires dismissal. *E.g.*, *Jackson*, 31 F. Supp. 3d at 888–89.

Here, each of the claims at issue arise from conduct connected to the professors' job responsibilities. As a preliminary matter, all of these claims arise from Wells's interactions with the professors through Texas Tech, whether through research or the mentorship program. *See generally* Dkt. No. 19. When claims "all arise from communications and interactions with the individual [d]efendants at [the university]," that demonstrates that the actions at issue were within the scope of their employment. *See Hundall v. Univ. of Tex. at El Paso*, No. EP-13-CV-365-DCG, 2014 WL 12496895, at *12 (W.D. Tex. Feb. 21, 2014). For example, a physical assault by a professor was within the scope of his employment because the assault occurred while the professor was proctoring an exam. *Jackson*, 31 F. Supp. 3d at 887–88. As in *Jackson*, the actions underlying each of Wells's tort claims are tied to the

professors' general job duties and arise in the context of her interactions with them in their employment.

Moreover, the tortious interference and trade secret misappropriation claims against Prien are connected to Prien's role as a mentor in the Accelerator program, which was part of his job as a professor at Texas Tech.  *See* Dkt. No. 19 ¶¶ 78–79, 96–98, 169–78.  Wells specifically alleges that the information at issue was disclosed by her to Prien during discussion "in the [Texas Tech] Accelerator Mentor program."  *Id.* ¶ 96.  His alleged wrongful disclosure related to a presentation at the annual ASRM conference.  *Id.* ¶¶ 96–100.  Based on his duties as a Texas Tech professor of reproductive physiology, Prien routinely attends and presents research at this conference, which is exactly what the alleged wrongful disclosure in his abstract of his research presentation entailed.  *See id.* ¶¶ 18, 38, 44, 51, 57, 72, 96–100.  Wells's conclusory claim that these actions were in bad faith and outside the scope of his authority provide no reason to ignore the clear factual allegations giving rise to the claims that refute her assertions.  *See Smith*, 31 F.4th at 914.  And the wrongfulness of the disclosure or malicious motives are irrelevant.  *Garza*, 574 S.W.3d at 401.  Again, a defendant's actions exceed the scope of his employment only when "the alleged misconduct ha[s] nothing to do with the employee's duties."  *Wilkerson*, 878 F.3d at 160.  Obtaining information about the research Wells and her company were conducting through his work as a mentor in the Accelerator program and giving presentations at the annual conference are of the general nature of Prien's job responsibilities as a professor, making this conduct within the scope of his employment and therefore covered by Section 101.106(f).  *See Wilkerson*, 878 F.3d at 159–60; *Jackson*, 31 F. Supp. 3d at 887–88.

As for the unjust enrichment and breach of fiduciary duty claims against Penrose and Prien, these claims also arise from the scope of their employment. These claims are based on patented inventions that, as alleged, resulted from Wells's work with the professors in their labs and conversations with them related to that research during her time as a student. *See* Dkt. No. 19 ¶¶ 47–50, 53, 76, 101, 188–97. Such claims would clearly not exist without these actions within the scope of their work as professors. Wells's claims arise from their alleged relationship as co-inventors which was created through these interactions while the professors were carrying out their job duties. *Id.* ¶¶ 190–91, 194. Also, the revenue and royalty issues clearly stem from Texas Tech's policies and the arrangement that Prien need to submit to the university as part of obtaining a patent. *See id.* ¶¶ 49, 76. From these allegations, it is evident that the actions giving rise to these claims pertain to the individual defendants' work as professors and their responsibilities related to research, interactions with students, and arranging royalty shares for patent inventions derived from their research. *See id.* ¶¶ 47–50, 53, 76, 101, 188–97. To the extent the nondisclosure of the specifics of the arrangement or the arrangement itself harmed Wells, this arises from the research and conversations leading to the patent and the manner in which they determined and submitted the royalty information to Texas Tech—conduct within the scope of their employment. Accordingly, these claims also must be dismissed under Section 101.106(f).

In sum, all of Wells's tort claims are subject to dismissal under Section 101.106 either because she irrevocably elected to pursue them against the professors in their official capacity, or the factual allegations make clear that such actions arise from their official duties, making them immune. The Court therefore dismisses Wells's tort claims.

### E.    Statutory Trade Secret Misappropriation Claim

Next, to the extent Wells is also asserting a statutory trade secret misappropriation claim based on the Texas Uniform Trade Secrets Act (TUTSA), the Court also dismisses this claim.[8]  Wells's amended complaint does not plausibly allege that she owned any trade secret that was misappropriated.

To state a TUTSA claim, a plaintiff must allege that "(1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant [disclosed or] used the trade secret without authorization from the plaintiff."  *See CAE Integrated, LLC v. Moov Techs., Inc.*, 44 F.4th 257, 262 (5th Cir. 2022) (emphasis omitted) (quoting *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 325 (5th Cir. 2018)); *Well Cell Global LLC v. Calvit*, No. H-22-3062, 2024 WL 709657, at *5 (S.D. Tex. Feb. 21, 2024); Tex. Civ. Prac. & Rem. Code § 134.002(3).  The statute defines a trade secret as

> all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:
>
> (A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

---

[8] Wells's amended complaint does not provide any indication that she is bringing a TUTSA claim. Dkt. No. 19 ¶¶ 174–79.  She does not cite or otherwise reference it in the complaint.  *See generally id.*  Nevertheless, both parties address the trade secret claim as under tort and the TUTSA.  Dkt. Nos. 25 at 8–10, 16–18; 34 at 5, 7–8.  Given that the TUTSA preempts other state remedies based on trade secret misappropriation, such as any tort claims based on facts related to misappropriation, it does not seem that she could bring a trade secret misappropriation claim on any state law basis other than the TUTSA.  *See* Tex. Civ. Prac. & Rem. Code § 134A.007; *Baylor Scott & White v. Proj. Rose MSO, LLC*, 633 S.W.3d 263, 287 n.14 (Tex. App.—Tyler 2021, no pet.).

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac. & Rem. Code § 134A.002(6).  Importantly, a plaintiff must actually own the alleged trade secret at issue.  *E.g.*, *Morris-Shea Bridge Co. v. Cajun Indus., LLC*, No. 3:20-cv-342, 2021 WL 4084516, at *7 (S.D. Tex. Feb. 22, 2021); *Penthol, LLC v. Vertex Energy Operating, LLC*, No. 4:21-cv-416, 2024 WL 987568, at *12 (S.D. Tex. Mar. 7, 2024).

Wells's amended complaint fails to identify any trade secret that she owned that was allegedly misappropriated by Prien.  She argues that she has alleged a trade secret based on "the information subject to her agreement with Simplot."  Dkt. No. 34 at 8.  But, for a litany of reasons, she has not plausibly alleged that she can bring a trade secret misappropriation claim based on this data.  For one, her own allegations demonstrate that, assuming a trade secret existed, it belongs to her past or present companies, not to her.  *See* Dkt. No. 19 ¶¶ 81–82, 87, 95–99, 175.  The only factual allegations related to an "agreement with Simplot" is that of her now-defunct company Embryotics, which "had an existing non-disclosure agreement in place with Simplot."  *Id.* ¶¶ 81, 97.  Without ownership of the trade secret, Wells cannot sue for any alleged misappropriation.  *See Morris-Shea Bridge Co.*, 2021 WL 4084516, at *7.  And even if Wells were the proper owner of the supposed trade secret, she has not alleged how "*the owner* of the trade secret has taken reasonable measures under the circumstances to keep the information secret."  *See* Tex. Civ. Prac. & Rem. Code § 134A.002(6) (emphasis added).  Instead, by her own claims, she provided the information to Prien without any agreement between him and her or her companies to maintain the secrecy of the information.  *See* Dkt. No. 19 ¶¶ 96–98.  She cites other agreements between her companies and Simplot and Prien and other entities regarding confidentiality, but no

measure that she—the putative owner of the secret—took.  *Id.*  Her mere reliance on other entities' secrecy efforts makes it implausible that she took reasonable measures to ensure secrecy given that her allegations indicate that she took no actions at all.

Independent of these problems, Wells's allegations also fail to adequately allege a trade secret in the first place.  A trade secret must be identifiable and "derive[] independent economic value, actual or potential, from not being generally known."  Tex. Civ. Prac. & Rem. Code § 134A.002(6).  Wells does not properly identify a trade secret or explain how it derives economic value from not being generally known.  While a plaintiff does not need to provide a specific description of the trade secret, *GlobeRanger Corp. v. Software AG USA, Inc.*, 836 F.3d 477, 493 (5th Cir. 2016), her "definition of a trade secret cannot be too vague or inclusive," *Utex Indus., Inc. v. Wiegand*, No. H-18-1254, 2020 WL 873985, at *10 (S.D. Tex. Feb. 21, 2020).  At minimum, a plaintiff must "identify specific groupings of information that contain trade secrets, identify the types of trade secrets contained in the groupings, and explain how the alleged trade secrets were maintained and treated as trade secrets."  *Vianet Grp. PLC v. Tap Acquisition, Inc.*, No. 3:14-CV-3601-B, 2016 WL 4368302, at *20 (N.D. Tex. Aug. 16, 2016).  Wells's amended complaint merely identifies the information as "data from her research as part of Embryotics and EmGenisys."  Dkt. No. 19 ¶ 175.  This definition is incredibly vague and overinclusive.  It provides no "specific groupings of information" and does not identify how this data has any economic value.  *Cf. Vianet Grp. PLC*, 2016 WL 4368302, at *19–20 (finding sufficient identification of a trade secret based on identified specific documents and explanation of the information contained within and the economic value of it).  The only allegation giving any indication of value is that "Embryotics covered all the expenses" for research related to this data.  Dkt. No. 19 ¶ 81.  This is a far cry from

typical sufficient allegations explaining the significant expense and time of obtaining the secret and the competitive advantage its secrecy provides. *See, e.g.*, *Vest Safety Med. Servs., LLC v. Arbor Environmental, LLC*, No. H-20-812, 2020 WL 4003642, at *4 (S.D. Tex. July 15, 2020); *Vianet Grp. PLC*, 2016 WL 4368302, at *19. Instead, it is a broad description that "fails to point to specificities that convey the unique capabilities of the [research]" and is therefore insufficient. *WeInfuse, LLC v. InfuseFlow, LLC*, No. 3:20-CV-1050-L, 2021 WL 1165132, at *3 (N.D. Tex. Mar. 26, 2021).

In light of the foregoing, the Court dismisses Wells's TUTSA claim as well because she has not plausibly alleged that she owned any trade secret. Her allegations reveal that the information at issue belonged to her companies and are too conclusory to properly identify a trade secret.

### F.     Equal Protection Claim

Finally, Wells asserts a claim under 42 U.S.C. § 1983 that Prien and Penrose violated the Equal Protection Clause of the Fourteenth Amendment. Dkt. No. 19 ¶¶ 150–59. The Court dismisses this claim as well.

Section 1983 provides a cause of action when a person, acting under color of a State law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. While "state officials literally are persons," when sued in their official capacity, they are not "persons" under Section 1983 because they are mere stand-ins for a State itself. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). The defendants assert that they are immune because she has sued them in their official capacity, and they therefore do not count as "persons" under Section 1983.

– 36 –

Dkt. No. 25 at 11.  Wells does not dispute that she has sued these defendants in their official

capacity for the Section 1983 claim.  Dkt. No. 34 at 6.

Nevertheless, Wells argues that the claim is not barred because "she alleges ongoing

violations of federal law."  *Id.*  Since "official-capacity actions for prospective relief are not

treated as actions against the State," an official is a "person" under Section 1983 when a

plaintiff seeks injunctive relief.  *Will*, 491 U.S. at 71 n.10.  For this theory to be viable, her

"lawsuit must allege that the defendants' actions are *currently* violating federal law," not "a

*prior* violation of federal law."  *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 737 (5th Cir.

2020) (emphasis in original).  But Wells's own amended complaint belies any argument that

this claim is based on an ongoing violation.  Dkt. No. 19 ¶¶ 150–59.  Each portion of her

Section 1983 claim points to past harassment—none is forward-looking:

> 152. Dr. Prien and Dr. Penrose *subjected* Dr. Wells to the foregoing harassment
> and adverse actions because of her sex.
>
> 153. The harassment and differential treatment Dr. Prien and Dr. Penrose
> *subjected* Dr. Wells to *did not serve* any compelling state interest or government
> objective.
>
> 154. Dr. Prien and Dr. Penrose *did not have* a rational basis for discriminating
> against Dr. Wells that was linked to a legitimate government interest.
>
> 155. Dr. Prien and Dr. Penrose *were motivated* by animus towards Dr. Wells
> because of her sex.
>
> 156. Dr. Prien and Dr. Penrose *deprived* Dr. Wells of her right to Equal
> Protection in violation of the Fourteenth Amendment of the Constitution of
> the United States and 42 U.S.C. §1983.
>
> 157. Dr. Prien and Dr. Penrose *acted* intentionally, or with deliberate
> indifference or callous disregard for Dr. Wells' right to Equal Protection in
> violation of the Fourteenth Amendment of the Constitution of the United
> States and 42 U.S.C. §1983.

158. As a direct and proximate result of Dr. Prien and Dr. Penrose's violation of the equal protection guarantee of the Fourteenth Amendment as set forth in this complaint, Dr. Wells *suffered* irreparable harm, including loss of her fundamental constitutional rights, entitling her to relief against Dr. Prien and Dr. Penrose.

*Id.* ¶¶ 152–58 (emphasis added).

Nor do her factual allegations plausibly indicate any ongoing harassment. *See generally id.* There are no claims of current or future interactions between the professors and Wells.[9] *Id.* The last dated factual allegation regarding Penrose pertains to a meeting on August 19, 2019. *Id.* ¶ 93. And there is no indication of any possible harassment by Penrose after that time. *See generally id.* As for Prien, there are no factual allegations related to possible harassment or discrimination by him after he emailed the "Time to Move on Song" about Wells at some point in May or June 2022. *See id.* ¶¶ 108–10. By her own account, Wells has not been involved with anything at Texas Tech since June 2022, besides other university representatives attempting to speak to her about her claims. *Id.* ¶¶ 112, 116. Wells has provided no plausible basis to infer that she is facing ongoing violations of her federal rights.

Moreover, Wells's assertion that her request for declaratory relief saves her claim is also meritless. *See* Dkt. No. 34 at 6. The mere fact that a declaratory judgment would be awarded in the future does not make it prospective relief. Instead, she asks the Court to provide—as explicitly stated in her amended complaint—"declaratory relief finding that Dr. Prien and Dr. Penrose *violated* Dr. Wells' [c]onstitutional right to Equal Protection." Dkt. No. 19 ¶ 159 (emphasis added). This amounts to a request for a "declaratory judgment[] expressly adjudicating the question of past violations" and is the exact kind of retrospective

---

[9] Much less ones occurring under color of state law. *See* 42 U.S.C. § 1983.

relief that the Court cannot order against the State or its officials acting in their official capacity absent a waiver of sovereign immunity. *Green v. Mansour*, 474 U.S. 64, 67–68, 73–74 (1985); *Williams ex rel. J.E.*, 954 F.3d at 737. Accordingly, Wells has failed to allege a cognizable Section 1983 claim against the professors.

## 4.    Conclusion

In sum, the Court grants the original motions to dismiss (Dkt. Nos. 15; 16) as to Wells's tort claims that are barred by Section 101.106(e), denies them as moot as to the other claims, and grants in full the new motions to dismiss (Dkt. Nos. 24; 25). While Wells has requested leave to amend, Dkt. Nos. 34 at 8–9; 35 at 9, the Court denies her request. Given the litany of problems with each of her claims and the fact that many of these defects are immunity or statute-of-limitations issues that cannot be cured by amendment, amendment would be futile. She has given no indication of how she would fix any defect, and she has already amended her complaint following the defendants' first motions to dismiss, which outlined many of these issues. Wells is not pro se, and there is no reason to think she has not already pled her best case. For these reasons, the Court dismisses all of Wells's claims with prejudice.

So ordered on May 7, 2024.

_James W. Hendrix_
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE